**William H. MARX and Florence Marx, his wife, Plaintiffs-Appellants,**

v.

**COMPUTER SCIENCES CORPORATION, Defendant-Appellee.**

**No. 73–1548.**

United States Court of Appeals, Ninth Circuit.

Nov. 22, 1974.

George M. Hartung, Jr. (argued), of LeSourd, Patten, Fleming & Hartung, Seattle, Wash., for plaintiffs-appellants.

Don Paul Badgley (argued), of Bogle, Gates, Dobrin, Wakefield & Long, Seattle, Wash., for defendant-appellee.

Before MERRILL and KOELSCH, Circuit Judges, and JAMESON,* District Judge.

## OPINION

KOELSCH, Circuit Judge:

The plaintiffs (hereinafter Marx) appeal from a summary judgment for defendant Computer Sciences Corporation (CSC) on plaintiffs' claim for damages allegedly resulting from the violation of Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b–5 of the Securities and Exchange Commission and from the denial of plaintiffs' cross-motion for partial summary judgment on the issue of liability.[1]

Marx predicates his claim upon an earnings forecast made by CSC. His contention in substance is that the forecast was not in accordance with the requirements of § 10(b) of the Act and Rule 10b–5, in that it was both "untrue" and omitted material facts required to make it "not misleading."[2]

"Summary judgment of course is proper only where there is no genuine issue of any material fact or where viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law." Stansifer v. Chrysler Motors Corporation, 487 F.2d 59, 63 (9th Cir. 1973). We thus turn to the record to ascertain from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" whether the ruling of the district court was correct.

In brief, the following "facts" appear:

Marx is a knowledgeable and experienced private investor. For some time prior to January 23, 1970, he had been closely studying various financial reports concerning CSC, a company whose business consisted principally of the development and merchandising of computer-related services, known as proprietary systems, one of which, "Computicket" (CT), was currently being developed. CSC's general accounting practice was to initially capitalize development expenses, rather than to treat them as charges against current income. And when a system became fully operational—defined as generating revenue in excess of expenses—CSC would then change its accounting treatment and begin to charge off the accumulated development expenses against income. CSC's current registration statement, filed with the Securities and Exchange Commission in April, 1969, and which Marx had studied, contained the statement that CSC expected to begin expensing CT on October 1 of that year; the statement in the ensuing prospectus was to the same effect:

* The Honorable William J. Jameson, United States District Judge for the District of Montana, sitting by designation.

1. The complaint names three plaintiffs: William H. Marx, his wife and son. In this opinion we refer to Marx alone, for he is the party most actively prosecuting the action. We note, too, that this purports to be a class action; however, the district court made no Rule 23 ruling, and that aspect of the suit is not now an issue.

2. These are the pertinent portions of the statute and rule:

§ 10(b):

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(a) * * *

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

"(1) * * *

"(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, * * * *"

"It is CSC's policy to capitalize all costs applicable to developing proprietary programs and systems and to amortize such costs over estimated total revenues from the sale of such programs and systems over a specified time period. At July 25, 1969, $17,-580,000 relating to the costs incurred in developing proprietary systems were capitalized. This figure includes $6,800,000 of expenditures incurred in connection with the developing and marketing of COMPUTICKET. The company plans to treat all such additional costs incurred for development of COMPUTICKET after October 1, 1969 as expenses and to charge them against revenues." [3]

On January 23, 1970, William R. Hoover, then a vice president and director of CSC, delivered a carefully prepared speech at a meeting in New York of the New York Society of Security Analysts. In it he stated:

"In concluding my remarks, I would like to briefly discuss a few aspects of CSC's financial performance. Approximately three years ago, Fletcher Jones, Chairman of CSC, forecast revenues for the current CSC fiscal year of $100 million with a net income of 10% of revenue. While it will not be the policy of the company to forecast yearly earnings in the future, since it is so near the closing of our fiscal year (March 27) it is appropriate to compare our performance with Mr. Jones' forecast. I am pleased to say that CSC expects to exceed the revenue and profit forecast with a total revenue of approximately $105 million and a net income of approximately $1.00 per share on 12.8 million shares outstanding." [4]

Following delivery of the speech, printed copies were distributed and Hoover responded to questions from the audience. With respect to Computicket and Infonet, another CSC system, he did state that "neither . . . have yet reached full operational stage, neither one will begin to write down appreciable costs in this year"; however, no such intelligence was contained in the prepared speech, and the "broad tape" which disseminated the news of the forecast throughout financial circles simply carried the earnings forecast and made no mention of Computicket. Marx either saw or was advised of this news report the day it appeared. Having neither knowledge that CSC had not begun expensing CT on October 1, as indicated in the prospectus, nor any other information concerning CT's status and condition, he purchased 2,000 shares of CSC stock at a price of about $30.

The forecast did not prove correct. At the close of the fiscal year, earnings were only 41 cents (and CSC stock had dropped to about $10). The difference between that amount and the "approximately $1.00" forecasted was largely, if not wholly, the result of the "write-off" of the entire accumulated development cost (in excess of $10,000,000) of CT, which CSC abandoned shortly after the Hoover speech. Just when CSC arrived at this decision is not clear. But it does appear that CT troubles had been of long standing. From its inception, CT had not met internal projections or market capture expected of it. It was financed by loans from CSC, which in turn was dependent on the availability of short-term capital. It had experienced problems getting equipment installed, it had been running deficits of one-half a million dollars or more per month for several months before the time of the speech, and it had lost one of its contracts with the First National City Bank of New York for an outlet. Moreover, CSC had attempted, without success, to sell the CT proprietary package to vari-

3. The prospectus did contain this caveat:

"No assurance can be given that COMPUTICKET will be the first such system to become fully operational in a particular area or that the system can obtain a sufficient volume of business to recover development expenses or to achieve profitable operations."

But whether or not it is sufficient to, or did, put Marx on notice, we think is a factual question.

4. CSC's fiscal years ended March 27.

ous prospects for differing amounts and during October and November, 1969, had gone so far as to discuss CT's abandonment, although it then made no decision in that regard. In short, the inference is plain that the likelihood of CT's commercial success became progressively more doubtful with the passage of time.

After duly considering these facts, we conclude that the district court should not have granted summary judgment in favor of CSC.

## I. Potential Liability for Making an "Untrue Statement of a Material Fact."

▌ That a forecast, essentially a prediction, may be regarded as a "fact" within the meaning of the Rule is settled by G & M, Inc. v. Newbern, 488 F.2d 742 (9th Cir. 1973). In that case this court rejected a defendant's argument that his representations as to future earnings of a corporation were not actionable under Rule 10b–5 because mere opinion. We said:

"Under the securities law a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable. Here, however, considering the gross disparity between prediction and fact, and also considering Newbern's other misrepresentations and failures to disclose, which were relevant to the accuracy of his prediction, we have no difficulty in

finding this 'prediction' to be actionable. See, e. g., 1 Bromberg, supra, § 5.3 at 97; § 7.2(1) at 147–48; and cases cited therein." 488 F.2d at 745–46.[5]

▌ Nor can there be doubt that the forecast of earnings was a "material" fact. ·The applicable test of materiality is essentially objective (see 2 Bromberg, Securities Law: Fraud § 8.3, at 201 (1973)): ". . . whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965).[6] And generally earnings projections of a company constitute a prime factor in estimating the worth of its stock, especially when made close to the end of the fiscal year:

"While investors probably attach more significance to future earnings than to any other single factor, they tend to take predictions with a grain of salt because of their inherent uncertainties. But the uncertainty of a projection for a given period declines as the end of the period approaches." 2 Bromberg, supra, § 7.2(1) at 149.

Kripke, The SEC, The Accountants, Some Myths and Some Realities, 45 N.Y. U.L.Rev. 1151, 1197 (1970).

▌ The next question is, was the forecast an "untrue" statement. Of

---

**5.** As one leading commentator points out, many of the "facts" which cases treat as material, such as the value of accounts receivable or even the value of fixed assets, are essentially probabilities as to future capacities or expectations. Kripke, Rule 10b–5 Liability and "Material" "Facts," 46 N.Y.U.L.Rev. 1061, 1070 (1971). Accord: Sprayregen v. Livingston Oil Co., 295 F.Supp. 1376 (S.D.N.Y.1968).

**6.** The List test is the one suggested in the Restatement of the Law, Torts, § 538 (1938): "(2) A fact is material if (a) its existence or nonexistence is a matter to which a reasonable man would attach importance * * *." We are aware that in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Court in discussing materiality under § 14(a), dealing with proxy violations, employed a "might have been con-

sidered" requirement (p. 384) and that in Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), a case dealing with § 10(b), the Court spoke of materiality in terms of facts that "could have been expected to influence" (p. 153, 92 S.Ct. p. 1472), relying upon Chasins v. Smith,·Barney & Co., 438 F.2d 1167 (2d Cir. 1970): "whether a reasonable man . . . might well have acted otherwise . . .." 438 F.2d at 1171. And we note that at least one commentator suggests that the trend is toward relaxing the test to replace "would" with "may" type language. Note, SEC Rule 10b–5: A Recent Profile, 13 Wm. & Mary L.Rev. 860, 883–85 (1972). See also 46 N.Y. U.L.Rev. 187, 192–93 (1971). However, unless clearly directed otherwise by higher authority, we adhere in 10b–5 cases to the traditional and less speculative common law language of the objective test.

course in hindsight it turned out to be wrong. But at least in the case of a prediction as to the future, that in itself does not make the statement untrue when made. However, the forecast may be regarded as a representation that on January 23, 1970, CSC's informed and reasonable belief was that at the end of the coming period, earnings would be approximately $1.00. That is what a reasonable investor would take the statement to mean, and we believe it would be "untrue" when made if CSC did not then believe earnings would be in that amount or knew that there was reason to believe they would not be. In addition, because such a statement implies a reasonable method of preparation and a valid basis, we believe also that it would be "untrue" absent such preparation or basis.

■ In short, we are clear that the determination of untruthfulness vel non of a statement is inextricably linked with the so-called "scienter" requirement of a private 10b–5 action and involves an inquiry into the circumstances underlying the statement to ascertain whether or not the maker was guilty of some fault or otherwise culpable.[7] The necessity for such an inquiry is implicit in our observation in G & M, Inc. v. Newbern, *supra,* at 745–46 of 488 F.2d, that "a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable."

That some fault is necessary to bring a statement within the proscription of § 10(b) and the Rule, and the nature and degree of the fault, was the subject of considerable discussion in White v. Abrams, 495 F.2d 724 (9th Cir. 1974), a

case recently decided by this court. In that decision we rejected a "compartmentalized approach" (495 F.2d at 734) in favor of the broader "flexible duty standard" and thus held that although fault or culpability of some sort underlies all § 10(b) liability, it need not consist solely of elements essential to a claim for common law fraud or one for negligence but may be consisted of some of the elements peculiar to either. This approach, we declared, "is desirable in an area as complex as securities fraud litigation and will come more closely to improving the sanctity of information in the market place, as Congress intended, without severely hampering the trading in securities and the flow of information." (495 F.2d at 736).

■ Applying the flexible duty standard, we conclude that a jury, in light of the great importance attached to an earnings forecast, CSC's knowledge that investors would heavily rely thereon, and the disparity between the parties in access to the information necessary to judge the accuracy of the forecast, could reasonably find that CSC, by ignoring facts seriously undermining the accuracy of the forecast, failed to meet the duty imposed by § 10(b). We agree with CSC that there is nothing in the record conclusively proving that on January 23 CSC knew to a certainty that CT would soon be written off, and hence that the forecast was intentionally false; but we cannot agree that CSC, in light of the unsatisfactory performance of CT, was justifiably optimistic in its prediction and hence that the same may not be found actionably "untrue," or lacking in a reasonable basis.[8]

7. "The foregoing is not intended to suggest that projections could be subjected to statutory liabilities, either express or under rule 10b–5, in the same fashion as a statement of fact about last year's sales or the ownership of a building. Rather the sole factual elements of a projection should be that it represents management's view, that it was reached in a rational fashion and that it is a sincere view. Only these elements can be subject to a statutory liability, not the eventuation of the prophecy." *Kripke, supra,* 45 N.Y.U.L.Rev., at 1199.

8. Two days before Hoover delivered the forecast speech, CSC's independent auditors gave final approval for continued deferral of the change-over in accounting for CT expenses. CSC had then prepared the requisite SEC "8 K" form to publicly announce this fact. But the 8 K was not filed with the SEC until eight days following preparation; this by itself would support an inference that CSC knew the prospectus was misleading and a conclusion that the forecast was carelessly or recklessly made.

## II. *Potential Liability for "Omit[ting] to State a Material Fact Necessary in Order to Make the Statements Made . . . Not Misleading."*

Marx also relies on the "material omissions" portion of Rule 10b–5. The "nondisclosures" he asserts consists of CSC's failure to reveal, in connection with the forecast, that CT was not being expensed and its failure to likewise reveal numerous particular development problems concerning CT.

■ With respect to the first matter, we are clear that the reasonable investor could well be misled into assuming that the expected expensing of CT, voiced in the prospectus, had commenced and that the forecast figure included CT's probable profit or loss from October through March. And we cannot conclude, as a matter of law, that CSC's nondisclosure of the fact that CT was not operational and that its continued development expenses, which were running in excess of $500,000 a month, were still being debited to the asset account rather than credited against current income, would not influence the decision of a reasonable investor.[9] Both were matters directly bearing upon the economic health and growth potential of CSC in substantial measure.

■ Whether CSC should have publicized all or some of the particular problems it was experiencing with CT presents a nice problem. A company, of course, need not detail every corporate event, current or prospective, which has or might have some effect upon the accuracy of an earnings forecast. It must disclose only those facts which are material.[10] While we consider it doubtful that the failure to disclose any one of the distinct problems besetting CT, taken by itself, would constitute an actionable material omission under the rule,[11]

As we have noted, Hoover, after delivering his prepared remarks, stated in substance during the question and answer period, that CT was not operational. We agree that this would tend to negative, if not wholly overcome, any inferences that CSC was deliberately attempting to mislead. However, that CSC was not fraudulent does not necessarily exonerate CSC—it may have been derelict in not taking *adequate* precautions to see the news release was qualified with this information. In that regard, we think that a company is obliged to release material facts in a manner reasonably calculated to reach the investing public, at least in substance. A contrary or lesser requirement would permit a company to manipulate the statements by simply giving favorable information wide dissemination and releasing qualifications without publicity. In this case the evidence is sufficient to raise the issue.

9. Neither the statutes nor the rules explicitly require proof of reliance. However, reliance is a predicate to a private claim. 2 Bromberg, *supra,* § 8.6 at 209.

CSC argues, insofar as alleged omission of material facts are involved, that Marx did not rely on the omission as a matter of law. Because Marx purchased immediately upon seeing the forecast figure on the broad tape, and because the tape carried only the $1.00 forecast and not the speech, CSC argues that any omissions from the speech are irrelevant, as disclosures would not have appeared on the tape and Marx would have purchased the stock in either event. The trouble with CSC's argument is that it contains the unwarranted assumption that a material disclosure would not have accompanied the forecast on the broad tape and affected Marx's decision to purchase. Moreover, Marx may reasonably rely on the supposition either that the company has not omitted material facts conditioning the forecast, or has chosen a means of dissemination which will contain necessary qualifications—failure to do either may be actionable. *See* n.8 *supra.* With respect to the omissions upon which Marx relies, the statement of the Court in Affiliated Ute Citizens v. United States, 406 U.S. 128, 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), is particularly relevant:

"Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. (Citations omitted.) This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact."

10. Bromberg points out that "The bigger and more diversified the company, the less material a given bit of information is." 2 Bromberg, *supra,* § 8.3, at 201.

11. The contract, recently terminated by the First National City Bank, simply concerned one outlet for CT, and such outlets were interchangeable.

we nevertheless cannot say as a matter of law that the failure to disclose some or all of them would not influence the decision of a reasonable investor. An earnings forecast is a shorthand description of the general financial well-being of a company; it creates an influential impression of the condition of the company in the eyes of the investing public.[12] Under the statute and rule, when an earnings forecast is made, such facts should be disclosed as are necessary to allay any misleading impression thereby created. In this case, whether the failure to disclose the existence and nature of each of CT's problems, or any partial combination of them, was an omission "to state a material fact necessary in order to make the statements made . . . not misleading" is a factual determination properly left to the jury.

In sum, we hold that a jury could reasonably find: (1) that the $1.00 per share earnings forecast was an "untrue statement of a material fact" actionable under Rule 10b–5, and (2) that the failure to disclose, at the time of the forecast, that CSC had not commenced expensing CT as represented in the prospectus, or other facts indicating that CT was in serious financial trouble, was an omission "to state a material fact necessary in order to make the statements made . . . not misleading." As liability may permissibly be predicated on either or both of these theories, the district court should not have granted summary judgment for CSC.

We question whether CSC was attempting to sell portions of CT at declining prices, as Marx asserts. The record indicates that the offers were not comparable, in that they differed from each other in terms. But even if the terms, save for the price, were the same, the attempts to sell were not unusual, in that such was the publicly avowed purpose of CSC—to merchandise its systems.

The undisclosed facts held to be material in Globus v. Law Research Service, Inc., 418 F.2d 1276 (2d Cir. 1969), and in Chris Craft Industries v. Piper Aircraft Corp., 480 F.2d 341 (2d Cir. 1973), are in marked contrast to those here. In Globus the nondisclosure went to a matter upon which the continued existence of the company directly depended;

The judgment is vacated, and the cause is remanded to the district court for further proceedings.

in Chris Craft the nondisclosure related to the pendency of negotiations looking to the disposal of an important capital asset of the company at less than one-third of its listed book value.

12. We are clear that an omission found to be "material" might be actionable even if the earnings forecast turned out to be substantially correct. For example, had CSC delayed their "write-off" of CT to a subsequent year, thus rendering the forecast "correct," the failure to disclose CT's problems existing at the time of the forecast might still be actionable due to the erroneous impression of the health of the company thereby conveyed and the pitfalls concealed.