Roger W. KIRBY, et al., Plaintiffs,

v.

CULLINET SOFTWARE, INC., and
Robert W. Goldman, Defendants.

Civ. A. No. 85–3204–WF.

United States District Court,
D. Massachusetts.

Aug. 18, 1989.

Glen DeValerio, Meg Dobies, Berman, DeValerio & Pease, Boston, Mass., Pomerantz Levy Haudek Block & Grossman, Steven Hoffman, Stanley M. Grossman, Marc I. Gross, New York City, Samuel D. Heins, Tanik & Heins, Minneapolis, Minn., Samuel Sporn, Schoengold & Sporn, New York City, Herbert Milstein, Cohen, Milstein & Hausfeld, Washington, D.C., Deborah R. Gross, Gross, Sklar & Metzger, Philadelphia, Pa., for plaintiffs.

Robert S. Frank, Jr., Mitchell H. Kaplan, Laurence D. Pierce, Choate, Hall & Stewart, Boston, Mass., for Cullinet Software, Inc.

George F. Hritz, Davis Markel & Edwards, New York City, for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

In this case, plaintiffs allege that during the period of May 30, 1985 to August 5, 1985, Cullinet Software, Inc. ("Cullinet") and its president, Robert M. Goldman, engaged in a common course of conduct designed to inflate the market price of Cullinet stock in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b) and Rule 10b–5, 17 C.F.R. 240.10b–5. Plaintiffs' claims are based on public statements made by Cullinet officials, including

Goldman, on May 30, June 17, and July 18, 1985.

This case has previously been certified as a class action. *Kirby v. Cullinet,* 116 F.R.D. 303 (D.Mass.1987). The class consists of purchasers of Cullinet stock from May 30 to August 5, 1985, who claim to have been injured by a common course of fraudulent conduct beginning before July 15, 1988.[1]

Since class certification, the parties have engaged in extensive discovery. Defendants now move for summary judgment. Upon consideration of the submissions of the parties and several hearings on the motion for summary judgment, the court concludes that the motion is in part meritorious. More specifically, the court finds that the motion for summary judgment should be allowed with regard to individuals who purchased Cullinet stock prior to June 17, 1985, and denied with regard to those who acquired Cullinet stock between June 17 and August 5, 1985. As explained in this opinion, plaintiffs have not introduced adequate evidence to place in genuine dispute the material question whether a May 30, 1985 Cullinet press release was knowingly false or made recklessly. Plaintiffs have, however, offered evidence which would justify consideration by a jury of whether statements made by Cullinet on June 17, 1985 and July 18, 1985 were part of a course of conduct which violated the federal securities laws.

As a result of this decision, the prior class certification order must be amended to reflect that the remaining class in this case consists of purchasers of Cullinet stock between June 17 and August 5, 1985 who claim to have been injured by a common course of fraudulent conduct during that period.

I. *Background and Undisputed Facts*

Certain facts which provide the context of this case are not disputed by the parties. They include those set forth below.[2]

Cullinet is in the business of developing, marketing and supporting highly complex computer software for use with IBM mainframe and other powerful computers. Its stock is traded on the New York Stock Exchange. Amended Complaint and Answer ¶¶ 5, 6.

Cullinet made its first public offering of common stock in 1978. It then experienced 29 consecutive quarters of economic growth before the first quarter of fiscal year 1986, which is the focus of this case. *Id.* ¶ 13. Traditionally, Cullinet's operating margin (operating profit as a percentage of its sales) exceeded 20%. *See* Affidavit of David Parkinson, Cullinet Corporate Controller, ¶ 7 (October 20, 1986).

In spite of a general downturn in the industry in early 1985, during the final quarter of Cullinet's fiscal year ending April 30, 1985, its revenues increased by 50% and its net income increased by 42% over the fourth quarter of the prior fiscal year. Amended Complaint and Answer ¶ 16.

Until May, 1985, Cullinet had a policy of not making public statements regarding income or profit projections. Deposition of Robert Goldman, Cullinet President, at 20–21 (March 11, 1987). In May, 1985, however, Cullinet made the first of several such statements which are relevant to this case.

On May 30, 1985, Cullinet issued a press release announcing that "while it is too early in the first quarter to be sure" Cullinet "expects to grow in its first quarter of fiscal 1986 [May 1 to July 31, 1985] by 30% to 40%" and that it "expects to meet Cullinet's traditional 20% operating margin goal for the quarter and the year." Parkinson Aff., Exhibit A.

On June 17, 1985, Cullinet issued another press release in which Cullinet reported that it had achieved 50% sales growth in the fourth quarter of fiscal 1985. The

---

**1.** The previously certified class does not include purchasers who might assert claims based only on misrepresentations allegedly made on July 18, 1985, rather than on a course of conduct beginning earlier. *Kirby,* 116 F.R.D. at 312 n. 2.

**2.** The evidence concerning the facts which plaintiffs claim are material and genuinely in dispute is discussed *infra.*

press release also quoted Cullinet President Robert Goldman as saying that "[b]ased on the excellent fourth quarter and fiscal 1985 results, we are confident that in fiscal 1986 Cullinet will continue to exceed industry growth rates." Parkinson Aff., Exhibit B.

On July 18, 1985, Cullinet officials met with a group of stock market analysts to discuss Cullinet's performance and prospects. A transcript of the meeting was produced by Cullinet in discovery.[3] At that meeting, Cullinet officials discussed the company's performance in the prior fiscal year (Tr. at 2–3); characterized the traditional 20% operating margin as important and, indeed, "sacred" (Tr. at 23); and Cullinet Chairman John Cullinane said he felt "comfortable with 30–40 [percent growth] for the first, for the whole year, but [he was] not forecasting that. Tr. at 28. In addition, Cullinane stated that despite swings in the economy as a whole and in the software industry in particular, Cullinet "can sail through ... reasonably unscathed." Tr. at 24.

On August 6, 1985, Cullinet disclosed that estimated revenues for the quarter that ended July 31, 1985, had increased 4–5% over the first quarter of the prior fiscal year, and that operating margins would be 13–14%. The day after this disclosure, the market price of Cullinet common stock fell from $24 to $18 a share.

## II. *The Positions of the Parties*

The plaintiffs contend that Cullinet's public statements between May 30 and August 5, 1985 were each false or misleading components of a continuing, fraudulent course of conduct.[4] More specifically, plaintiffs allege that when it made each of

its public statements Cullinet knew or should have known that its optimistic projections could not be met; in any event Cullinet improperly failed to correct the May 30, 1985 projection for the first quarter of fiscal year 1985 when it became evident that it was unreliable; and that when viewed in context the June 17 and July 18, 1985 statements were misleading.

Defendants argue that the projection of 30–40% growth announced on May 30, 1985 constituted a warning that Cullinet did not expect to sustain its historic quarterly growth rate of 50%. Defendants also claim that until final figures were compiled in August, 1985 Cullinet officials believed in good faith that this projection could be met. They assert that defendants did not act recklessly in making, and then not correcting, the projection because each of Cullinet's public statements was consistent with the figures generated by its forecasting system, which had always been reliable in the past.

## III. *Discussion*

### A. Summary Judgment Standard

Fed.R.Civ.P. 56(c) provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The function of summary judgment is "to pierce the formal allegations of facts in the pleadings ... and to determine whether

---

**3.** Defendants contend that neither the transcript nor the analysts' reports of the July 18, 1985 meeting are admissible and, therefore, neither should be considered in deciding this motion for summary judgment. Defendants, however, are incorrect. As the transcript was prepared and produced by Cullinet, the court is satisfied that it is an adequately accurate record of the July 18, 1985 meeting, at least for present purposes. *See* Fed.R.Evid. 901. As the statements are offered by plaintiffs and are those of a party-opponent, they are not hearsay. *See* Fed. R.Evid. 801(d)(2). Similarly, the analysts' reports of the meeting, which need not be con-

sidered for present purposes, may not be hearsay because they are offered only to prove that Cullinet officials made particular statements and not to prove that those statements were true. *See Jauch v. Corley,* 830 F.2d 47, 52 (5th Cir.1987) (media report of allegedly libelous statement admissible to prove statements made); *Williams v. City of Valdosta,* 689 F.2d 964, 972 n. 5 (11th Cir.1982) (same).

**4.** Goldman is charged as a "controlling person" of Cullinet within the definition of § 20 of the Exchange Act, 15 U.S.C. § 78t.

further exploration of facts is necessary." *Hahn v. Sargent,* 523 F.2d 461, 464 (1st Cir.1975) (citations omitted), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The court must examine the record "in the light most favorable to ... the party opposing the motion." *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

Although the moving party carries the burden of showing that he is entitled to summary judgment, Rule 56 sets forth a bifurcated standard under which the opposing party must establish the existence of a fact that is both "genuine" and "material." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). The substantive law of a case determines whether a fact is material. *Id.* at 248, 106 S.Ct. at 2510. As to genuineness of the factual dispute, the Supreme Court has stated that:

> [t]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.... If the evidence is merely colorable, ... or is not significantly probative ... summary judgment may be granted.

*Id.* at 249-50, 106 S.Ct. at 2511 (citations omitted). *See also Matsushita Electric Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (opponent must "do more than simply show that there is some metaphysical doubt as to the material facts").

■ Where, as here, the opposing party will bear the burden of proof on an issue at trial, the moving party need not produce evidence negating the claim that there is a material issue in genuine dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rather, the moving party's burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

■ This court understands that it must be particularly careful in granting summary judgment where, as in the instant case, state of mind is in question. *See Wechsler v. Steinberg,* 733 F.2d 1054, 1058-59 (2d Cir.1984) (issues of motive, intent, usually inappropriate for summary judgment). More specifically, a court should not grant summary judgment in a Rule 10b-5 case "unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive." *Id.* at 1059. However, summary judgment for the defendant is warranted when the plaintiff essentially rests on the allegations in his pleadings and fails to submit "any probative evidence, by affidavit or otherwise, to establish a genuine issue of material fact ... as to scienter." *Bryson v. Royal Business Group,* 763 F.2d 491, 494 (1st Cir.1985).

In essence, this court finds that plaintiffs have failed to make an adequate showing of scienter to survive the motion for summary judgment concerning the May 30, 1985 press release, but have succeeded in bearing their burden to place material facts genuinely in dispute with regard to Cullinet's subsequent statements and the alleged fraudulent course of conduct of which they are purportedly a part.

### B. Elements of a Rule 10b-5 Action

■ As the relevant substantive law defines the material facts which must be disputed by the evidence to defeat a motion for summary judgment, the elements of a Rule 10b-5 claim must be recognized. Rule 10b-5 states that it shall be unlawful for any person, directly or indirectly:

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading....

To prevail on a claim under Section 10(b) and Rule 10b-5, a plaintiff must show 1) a material misstatement and/or omission by the defendant; 2) scienter; 3) reliance; and 4) due care by the plaintiff. *Holmes v. Bateson,* 583 F.2d 542, 551 (1st Cir.1978). *Accord Kennedy v. Josephthal & Co.,* 814 F.2d 798, 804-05 (1st Cir.1987).

For the purposes of the motion for summary judgment, defendants do not claim

that the plaintiffs have failed to offer evidence sufficient to place the issues of reliance [5] and due care genuinely in dispute. Rather, defendants in effect argue that there were no material misstatements or omissions and, in any event, there is not adequate evidence of scienter to defeat their motion for summary judgment.

### 1. *Material Misstatement or Omission*

■ The plaintiffs do not claim that any of Cullinet's statements were false. Plaintiffs do, however, assert that Cullinet made a series of materially misleading statements as part of a course of conduct which violated Rule 10b–5. As this court has on another occasion explained in detail, for the purposes of the federal securities laws, a statement may be literally true, but nevertheless misleading. *Gillette Company v. RB Partners*, 693 F.Supp. 1266, 1286 (D.Mass.1988). The context in which a statement appears is an essential part of determining its legal adequacy. *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 201 (5th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988).

■ The Supreme Court has determined that a misstatement or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important." *TSC Industries, Inc. v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *See also Holmes v. Bateson*, 583 F.2d 542, 557 (1st Cir.1978). This means that the misstated or omitted fact must be one likely to be viewed by a reasonable investor as significantly altering the total mix of available information. *TSC Industries*, 426 U.S. at 438, 96 S.Ct. at 2126. This standard for determining materiality is applicable in cases involving Section 10(b) and Rule 10b–5. *Basic*, 108 S.Ct. at 978.

### 2. *Scienter*

■ The scienter requirement of Rule 10b–5 is satisfied if plaintiffs prove "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185,

193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976). The Court of Appeals for the First Circuit has assumed, without deciding, that recklessness is sufficient to satisfy the scienter requirement of Rule 10b–5. *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 516 (1st Cir.1978); *Cook v. Avien*, 573 F.2d 685, 692 (1st Cir.1978). The parties, for present purposes at least, agree that it would be sufficient to prove scienter for plaintiffs to demonstrate that the defendants' conduct was reckless. Thus, this court too assumes that reckless as well as intentional conduct is actionable under Rule 10b–5.

The Court of Appeals for the First Circuit has approved an instruction that for the purposes of Rule 10b–5, recklessness is "carelessness approaching indifference." *Hoffman*, 587 F.2d at 516. As the Court of Appeals noted, this brief definition is consistent with tort law, which Prosser indicates defines reckless as meaning that:

the actor has intentionally done an act of an unreasonable character in disregard of a risk known to [the actor] or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It is usually accompanied by a conscious indifference to the consequences, amounting almost to willingness that they should follow.

*Id.* at 516 (quoting W. Prosser, *Law of Torts* 185 (4th ed. 1971)).

### 3. *Predictions*

■ The statements at issue in this case are predictions. While predictions are inherently uncertain, they are not exempt from the anti-fraud provisions of the federal securities laws. Rather, materially misleading predictions made with scienter are actionable. *Eisenberg v. Gagnon*, 766 F.2d 770, 775 (3rd Cir.1985); *Isquith*, 847 F.2d at 203; *Marx v. Computer Science Corp.*, 507 F.2d 485, 489 (9th Cir.1985); *Alfaro v. E.F. Hutton*, 606 F.Supp. 1100, 1104 (E.D.Pa. 1985); *Abrams v. Oppenheimer Government Securities, Inc.*, 589 F.Supp. 4, 9

---

5. The Supreme Court has held that a rebuttable presumption of reliance is permissible when, as here, plaintiffs rely on a fraud on the market theory of liability. *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 988–93, 99 L.Ed.2d 194 (1988).

(N.D.Ill.1984), *aff'd,* 737 F.2d 582 (7th Cir. 1984); *Eichen v. E.F. Hutton, Company, Inc.,* 402 F.Supp. 823, 829 (S.D.Cal.1975).

██ As the Court of Appeals for the Ninth Circuit said with regard to predictions in *Marx:*

> [T]he determination of untruthfulness vel non of a statement is inextricably linked with the so-called "scienter" requirement of a private 10b–5 action and involves an inquiry into the circumstances underlying the statement to ascertain whether or not the maker was guilty of some fault or otherwise culpable.

507 F.2d at 490. At a minimum, a prediction must be made in good faith and with a sound historical or factual basis. *Isquith,* 847 F.2d at 203; *Eisenberg,* 766 F.2d at 776; *Abrams,* 589 F.Supp. at 9. "In addition, because a [prediction] implies a reasonable method of preparation and a valid basis . . . . it would be 'untrue' absent such preparation or basis." *Marx,* 507 F.2d at 490.

 Moreover, "if a corporation voluntarily makes a public statement that is correct when issued, it has a duty to update that statement if it becomes materially misleading in light of subsequent events." *Greenfield v. Hueblein, Inc.,* 742 F.2d 751, 758 (3rd Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985). This principle applies to projections, as well as other public statements. *In re Kulicke & Soffa Industries, Inc. Securities Litigation,* 697 F.Supp. 183, 185 (E.D.Pa.1988). A statement, including a projection, however, must be misleading as to a material matter to be actionable. *See Basic,* 108 S.Ct. at 986.

The foregoing decisions concerning predictions are consistent with the Securities and Exchange Commission's interpretation of Section 10(b) as it applies to projections. In 1979, the Securities and Exchange Commission adopted a "Safe Harbor" Rule concerning projections included in filings with the Commission.[6] 17 C.F.R. § 230.175

(1988); *see* Safe Harbor Rules for Projections, Securities Act Release No. 6054 [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,117 (July 5, 1979). The Safe Harbor Rule was intended to encourage the disclosure of projections and forward looking information by clarifying a corporation's obligations concerning such statements. *Id.* at 81,940.

In essence, the Safe Harbor Rule provides that projections do not violate the federal securities laws if they are made or reaffirmed with a reasonable basis and in good faith. 17 C.F.R. § 230.175(a) (1988). In addition, the Securities and Exchange Commission has indicated that the Safe Harbor Rule incorporates an issuer's duty in certain circumstances to update or correct prior projections which are discovered to have been incorrect when made or no longer have a reasonable basis. As the Securities and Exchange Commission explained in its policy statement concerning the Safe Harbor Rule:

> [I]ssuers [have a] responsibility to make full and prompt disclosure of material facts, both favorable and unfavorable, where management knows or has reason to know that its earlier statements no longer have a reasonable basis.
>
> \* \* \* \* \* \*
>
> Moreover, the Commission believes that, depending on the circumstances, there is a duty to correct statements made in any filing . . . if the statements either have become inaccurate by virtue of subsequent events, or are later discovered to have been false and misleading from the outset, and the issuer knows or should know that persons are continuing to rely on all or any material portion of the statements.

[1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,117 at 81,943.

Applying the foregoing principles to the instant case, the court finds that plaintiffs have failed to offer adequate evidence concerning the basis for, and good faith of, the

---

**6.** Defendants recognized the relevance of the Safe Harbor Rule to the instant case by citing it in memoranda in support of their Motion for Summary Judgment. *See* Defendants' Memo-

randum in Support of Renewed Motion for Summary Judgment at 31; Defendants' Reply Memorandum—Motion for Summary Judgment at 19.

May 30, 1985 projection to defeat defendants' motion for summary judgment relating to that statement. The evidence is sufficient, however, to establish an issue to be decided by the jury concerning whether by June 17, 1985 Cullinet had a duty to correct the impression created by the May 30, 1985 projection, but failed to discharge that duty and instead engaged in a wrongful course of conduct by making a series of statements which were, in the circumstances, materially misleading.

## C. Cullinet's Public Statements

### 1. *May 30 Statement*

■ As indicated earlier, Cullinet's May 30, 1985 press release stated that "while it is too early in the first quarter to be sure" the company "expects to grow in its first quarter of fiscal 1986 [May 1 to July 31, 1985] by 30% to 40%" and that it "expects to meet Cullinet's traditional 20% operating margin goal for the quarter...." For the purposes of the motion for summary judgment, defendants have not asserted that this statement is insufficiently specific to constitute a material misrepresentation. Transcript of November 18, 1988 Hearing at 9–10. Defendants base their motion for summary judgment with respect to purchasers who allegedly relied on the May 30, 1985 press release primarily on the argument that there is no evidence in the record to support a finding of scienter. More specifically, defendants assert that there is no evidence to dispute its assertion that there was a reasonable basis for the May 30, 1985 projection and that it was made in good faith.

Plaintiffs make several related arguments in response to defendants' claims concerning the May 30, 1985 press release. Plaintiffs assert that there is adequate evidence to require a trial of the issue whether Cullinet commenced an illegal course of conduct with its May 30, 1985 statement because defendants allegedly knew that (1) the demand for computer products was weakening; (2) there was a negative reaction by customers to Cullinet's products; (3) the May, 1985 Cullinet sales figures were severely depressed; and (4) Cullinet's

forecasting system was inherently unreliable. Analysis of the evidence in the light most favorable to the plaintiffs, however, indicates that the foregoing alleged facts are not sufficiently supported by the evidence to permit a jury to conclude properly that plaintiffs have proven scienter.

The evidence on which plaintiffs rely to prove the illegality of the May 30, 1985 statement, and thus its part in an alleged continuous course of fraudulent conduct, consists of the following. In the first four or five months of 1985, Cullinet knew that economic conditions were forcing its potential customers to "dramatically tighten their belts." Deposition of Phyllis Swersky, Cullinet Senior Vice President, at 54, 65 (February 11, 1987); Goldman Dep. 22, 25, 35. Cullinet also knew that IBM, which supplied most of the hardware on which Cullinet software was used, was experiencing slow and reduced sales. Goldman Dep. at 25, 35. In addition, IBM began in early 1985 to market a product to compete with a major Cullinet product. Deposition of Ronald I. Dolinsky, Cullinet Sales Executive, at 56 (May 14, 1987) ("Dolinsky I").

Relying exclusively on a *Computerworld* magazine article (Plaintiff's Appendix E at 18281), plaintiffs claim that Cullinet customers were during fiscal year 1985 unhappy with its new ICMS Product line. In addition, Cullinet had during 1984 recalled its purchasing module. Deposition of Ronald I. Dolinsky, Cullinet Sales Executive, at 131, 135 (April 5, 1988) ("Dolinsky II").

Most significantly, plaintiffs argue that the projection in Cullinet's May 30, 1985 press release was based on a forecasting system which was inherently inreliable because it involved subjective judgments and, in view of the sales figures for May, 1985, Cullinet knew or should have known the forecast of 30–40% growth for the first quarter of fiscal year 1986 was unattainable. Plaintiffs base this argument on the evidence that when the May 30, 1985 press release was issued, Cullinet knew that its sales for the first three weeks of May were $905,000 and that it needed over $30,000,-000 in sales for the quarter to achieve 30% growth. Deposition of Frank L. Chisholm,

Cullinet Executive Vice President, at 63–64 (January 15, 1987); Plaintiff's Exhibit 11.

In addition, plaintiffs rely on a memorandum, and related deposition testimony, by Richard Fine, Cullinet's general accounting manager. Fine was responsible for calculating profitability based on various assumed levels of revenue. Using the 31% quarterly sales projection provided to him by Phyllis Swersky, Cullinet's principal sales officer, (Deposition of Richard Fine, Cullinet General Accounting Manager, at 17 (February 13, 1987)), Fine reported to Swersky and Goldman in a May 30, 1985 memorandum that quarterly expenses would have to be reduced by over $6,000,-000 in order to achieve a 20% operating margin. *See* Plaintiffs' Exhibit 17. Fine also broke down Swersky's quarterly sales projections into monthly revenues as follows: May—$7,369,000; June—$9,993,000; July—$14,738.00. *Id.* Plaintiffs have sought to characterize these monthly figures as Cullinet's "plan." They argue that because weekly sales reports were available to management, defendants knew that Cullinet was having a severely depressed month of May in relation to this "plan." The actual figures for May were available on June 4. Plaintiffs' Exhibit 10. They showed May sales of $1,937,000, nearly 74% below Fine's figures. *Id.; see also* Plaintiffs' Exhibit 5.

While plaintiffs' assertions have some superficial appeal, they do not survive scrutiny when considered in the context of the remaining evidence. Rather, even when viewed in the light most favorable to plaintiffs, the record demonstrates that Cullinet's internal forecasting system indicated that it would achieve 30–40% growth for the quarter, that it was reasonable for Cullinet to rely on that system as of May 30, 1985, and Cullinet did so in good faith.

The undisputed testimony of Cullinet's Executive Vice President Frank Chisholm, Dep. at 25–30, indicates the following. The software industry is unlike many other businesses because there is rarely a backlog of orders waiting to be filled. Cullinet's forecasting system involved a review of Cullinet's pipeline of business—potential customers evaluating Cullinet products—to predict which customers would make final decisions before the end of the quarter. The forecasting process began with reports on likely sales by the account executives who were in the field calling on potential customers. These reports were reviewed by district managers, again by regional managers, again (in some instances) by area managers, and finally by Chisholm. Likely sales were tracked at Cullinet's Massachusetts headquarters and data from the field was recorded and constantly updated. *See also* Chisholm Aff. ¶¶ 5–8. There is no evidence in the record indicating that this forecasting system had been inaccurate in the past. To the contrary, the evidence that the forecasting system had historically been reliable is undisputed. *See* Chisholm Aff. ¶ 8.

The fact that potential customers were "tightening their belts" in early 1985, does not suggest that Cullinet unreasonably relied on its forecasting system in May, 1985. Cullinet had achieved record growth in the quarter ending April 30, 1985, in which the "belt-tightening" and slow-down in sales of IBM products simultaneously occurred. Swersky Dep. at 54, 65; Goldman Dep. at 22, 25, 35. Similarly, with respect to competition from IBM, there was no consensus among the regional sales managers concerning the immediate impact of the new IBM product, but there was a consensus that Cullinet's products were superior. Dolinsky I Dep. at 60. In any event, Cullinet's projections were reduced from 50% to 30–40% growth for the first quarter of fiscal year 1986 partly in recognition of these economic and competitive conditions. Goldman Dep. at 34–35.

With respect to the purchasing module, Cullinet recalled the product six to nine months before the events at issue in this action—during Cullinet's record-breaking fiscal year 1985, when sales grew by 50%. In the only testimony on this issue cited by the parties, a regional sales manager for Cullinet stated that when the problems leading to the recall occurred they affected sales "minimally" and "lengthened the selling cycle," but by the first quarter of fiscal year 1986 he could not recall any

sales prospects raising this issue. Dolinsky II Dep. at 134–35. Thus, there is no evidence in the record to indicate that Cullinet officials believed, or should have felt, that this problem would have an impact on sales during the first quarter of fiscal year 1986.

Moreover, plaintiffs' most seductive argument—that the modest May, 1985 sales made it reckless to forecast 30% growth for the quarter—is not supported by the record. The undisputed evidence indicates that the overwhelming majority of Cullinet's sales usually occur toward the end of a quarter Chisholm Aff. ¶ 6. Similarly, plaintiffs offered no evidence to dispute the President of Cullinet's testimony that "it was not unusual" for Cullinet to generate over $24 million in sales in the final month of a quarter. Goldman Dep. at 85; *see also* Chisholm Aff. ¶ 6.

Nor does Fine's work suggest that Cullinet knew or should have known that its 30%–40% growth projection was unattainable. As directed by Swersky, Fine used a 31% quarterly sales projection to calculate the costs which would need to be cut to achieve a 20% operating margin. This indicates that Cullinet was assuming quarterly growth in the 30% range for internal planning purposes, and thus suggests Cullinet's good faith concerning its May 30, 1985 public announcement. It is true that Fine assumed sales in excess of $7,000,000 for May, 1985 in developing his figures and that actual sales for that month were less than $2,000,000. Fine's undisputed testimony, however, was that his monthly sales figures were simply his "guesses" of what monthly revenues would be and that he "didn't have a basis" for his monthly breakdown. Fine Dep. at 27.[7] In addition, there is no evidence that the individuals responsible for the May 30, 1985, press

release had Fine's May 30, 1985 memorandum when they prepared the release.

Nor is there evidence indicating that the actual sales figures for all of May, 1985 were available to Cullinet management on May 30, 1985. Rather, the evidence indicates this information was first available on June 4, 1985. Plaintiffs' Exhibit 10.

Moreover, the undisputed evidence shows that Goldman and Swersky frequently discussed the sales situation in the days immediately prior to issuing the May 30, 1985 press release. Chisholm Dep. at 79–80; Swersky Dep. at 57. As a result of a meeting on May 28, Cullinet's quarterly forecast for new domestic revenue was adjusted downward from $37 million to approximately $32 million. Goldman Aff. ¶¶ 3–4; Plaintiff's Exhibit 4. This reduced projection was reflected in the statement in the press release that while it was too early to be sure, Cullinet expected to grow 30–40% in the first quarter. Against a background of a record-breaking final quarter that ended a month before, the statements in the press release intended to inform the public that while Cullinet expected to continue to grow, it was anticipating a reduced rate of growth. Swersky Dep. at 53–54; Goldman Dep. at 21–22, 26, 31–35; Chisholm Dep. at 82.

Cullinet did not, of course, achieve a 30–40% increase in sales or a 20% operating profit for the first quarter of fiscal year 1986. This alone, however, is insufficient to indicate that the May 30, 1985 projection violated Rule 10b–5. *See Bryson,* 763 F.2d at 494 n. 7 (1st Cir.1985); *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978).

In view of the foregoing, after considering the evidence in light most favorable to plaintiffs, the court concludes that the plaintiffs have failed to offer evidence ade-

---

7. At the hearing on January 24, 1989, plaintiffs' counsel Glenn DeValerio represented to the court that Fine's monthly breakdowns were derived from Cullinet's past experience. The court asked counsel to identify evidence in the record to support this claim. Mr. DeValerio subsequently wrote to the court identifying an excerpt of Fine's deposition in which the witness stated that an unspecified document was prepared based upon "some background infor-

mation showing some historical actual financial results." Fine Dep. at 99–100. Mr. DeValerio did not refer to the portion of the transcript in which Fine said his monthly revenue figures for the specific document at issue were his "guesses" only. Fine Dep. at 27. The court is concerned about Mr. DeValerio's misstatement of the record, but will not now pursue the question whether it was intentional or inadvertent.

quate to permit a jury to infer properly that the May 30, 1985 projection lacked a reasonable basis, was knowingly false, or was made recklessly. That statement, therefore, may not be properly deemed the inception of a fraudulent course of conduct as plaintiffs allege. Thus, summary judgment for the defendants is appropriate with regard to this contention.

### 2. The June 17 and July 18, 1985 Statements

■ In contrast to the May 30, 1985 press release, the evidence viewed most favorably to plaintiffs is sufficient to permit a jury to conclude properly that the June 17 and July 18, 1985 Cullinet statements were material and intentionally or recklessly misleading, thus constituting parts of an illegal course of conduct to defraud the market as alleged by plaintiffs.

As the Supreme Court has said:

"The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's common stock is determined by the available material information regarding the company and its business.... Misleading statements therefore defraud purchasers of stock even if purchasers do not directly rely on the misstatements.... The causal connection between the defendant's fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

*Basic,* 108 S.Ct. at 989, (quoting *Peil v. Speiser,* 806 F.2d 1154, 9160–61 (3rd Cir. 1986)).

■ A company's course of conduct may constitute a fraud on the market. "Rule 10b–5 liability is not restricted solely to isolated misrepresentations or omissions; it may also be predicated on a 'practice, or course of business which operates ... as a fraud ...' Under that section class members may well be united in establishing liability for fraudulently creating an illusion of prosperity and false expectations." *Blackie v. Barrack,* 524 F.2d 891, 903 n. 19 (9th Cir.1975). Moreover, " '[l]ike standing dominoes ... one misrepresentation ...

[can] cause subsequent statements to fall into inaccuracy and distortion when considered by themselves or compared with previous misstatements" *Id.* at 904 (quoting *Fischer v. Kletz,* 41 F.R.D. 377, 381 (S.D.N.Y.1966)).

In this case, when the evidence described below is viewed in the light most favorable to plaintiffs, the court concludes that it would be permissible for a jury to infer that Cullinet's May 30, 1985 projection was material to investors; that by June 17, 1985, Cullinet knew or should have known that the projection would not be achieved; that Cullinet then had a duty to correct the projection or, in any event, had a duty not to make statements which while not literally false would convey the misleading impression that the recent promising prediction remained reliable; that rather than correcting the May 30, 1985 projection, Cullinet intentionally or recklessly crafted public statements which avoided mentioning the prospects for the first quarter of fiscal year 1986, but which reinforced the illusion of short term growth to which the May 30, 1985 projection contributed; and that Cullinet, therefore, engaged in a course of conduct constituting a fraud on the market.

More specifically, it would be reasonable for a jury to regard the May 30, 1985 prediction for the first quarter of fiscal year of 1986 as material. The economy generally, and the market for software particularly, was difficult. Cullinet had never made public predictions before. Apparently, however, Cullinet decided it was important to investors to know that while the company did not expect to grow at the record rate experienced in the previous quarter, *see* Chisholm Dep. at 79, it still anticipated growing significantly and maintaining its customary 20% operating margin. In these circumstances, it could properly be inferred that the May 30, 1985 prediction would be considered important because it significantly altered the total mix of available information, and was, therefore, material. *Basic,* 108 S.Ct. at 978.

It could also reasonably be concluded that by June 17, 1985 Cullinet had a duty to

disclose adverse developments or revise its recent prediction, and that it intentionally or recklessly failed to do so. By June 4, 1985, Cullinet knew that the sales for May had been only $1,943,000. Plaintiffs' Exhibit 10. At a June 14, 1985 staff meeting, Cullinet's Vice–President described business as "tight," and the need for reducing expenses was discussed. Plaintiffs' Exhibit 13. By June 17, 1985, Cullinet knew that its sales for the quarter were $3,112,000. Weekly "Green Bar" Report, June 14, 1985, Plaintiffs' Appendix, Tab G. Thus, Cullinet then knew that in the first half of the quarter it had made only one-tenth of the sales necessary to achieve 30% growth in a market which remained tight.

Cullinet did not in mid-June, 1985 disclose these adverse developments or correct its early predictions. Rather, on June 17, 1985, Cullinet issued another optimistic press release, stating that "Based on the excellent fourth quarter [of fiscal year 1985] results, we are confident that in fiscal 1986 Cullinet will continue to exceed industry growth rates." This statement may not have been literally false, but it would be permissible for a jury to consider whether it was material and intentionally or recklessly misleading in the context of the May 30, 1985 projection for the first quarter.

Similarly, it would be appropriate for a jury to consider whether the statements made at the July 18, 1989 meeting with stock analysts were part of a continuing fraudulent effort to leave the May 30, 1985 projection unqualified and uncorrected, to avoid discussing the prospects for Cullinet's first quarter, and to speak only about annual prospects in order to reinforce the impression that Cullinet would achieve its May 30, 1985 quarterly projection.

By July 18, 1985, Cullinet's President knew that the company needed to close in the next two weeks sales of at least $24,000,000 to achieve the 30% growth predicted on May 30, 1985. Goldman Dep. 84–85. Yet, at the meeting of analysts on July 18, 1985, Cullinet officials carefully avoided discussing anticipated performance for the first quarter, with its Chairman saying instead that the company was "comfortable with 30–40 [percent growth] for the first, for the whole year, but I'm not forecasting that." Tr. at 28. Cullinet officials also re-affirmed the 20% operating margin as "sacred" and indicated they expected Cullinet could "sail through" the downturn in the computer industry "reasonably unscathed." Id. at 24, 28.

On August 6, 1985, Cullinet disclosed that estimated revenues for the quarter that ended July 31, 1985 had grown only 4–5% as compared to the first quarter the previous year and its operating margin was 13–14%. The price of Cullinet stock fell significantly, from $24 to $18 a share, the next day. This fact would permit the inference that Cullinet's conduct was both material and misleading.

In support of its motion for summary judgment concerning its conduct between June 17 and August 6, 1985, Cullinet argues that no evidence has been presented to indicate that its statements that it expected to exceed industry growth rates in fiscal 1986 were inaccurate. Defendants' Reply Memorandum at 15. As described earlier, however, statements which are literally true may be misleading. Such possible statements must be viewed in context. In the context of this case, it would be permissible for a jury to infer that Cullinet not only improperly failed to discharge a duty to disclose developments relating to the May 30, 1985 projection, but made statements on June 17, and July 18, 1985 which were materially misleading.

Cullinet also contends that there is inadequate evidence to establish scienter concerning its conduct after May 30, 1985. Cullinet management uniformly testified they at all times believed that they would achieve 30–40% growth for the first quarter.

However, for the purposes of a motion for summary judgment, it must be recognized that a jury need not accept the testimony of defendants' witnesses when surrounding circumstances would support a contrary inference. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–58, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970);

**1456**

*Kronfield v. Transworld Airlines, Inc.*, 832 F.2d 726, 737 (2d Cir.1987). In this case, the evidence, when viewed most favorably to plaintiffs, would permit the conclusion that by mid-June, 1985 Cullinet management knew, or were reckless in not acknowledging, that the May 30, 1985 projection would not be achieved and should have been supplemented with accurate, current information concerning Cullinet's first quarter, but that Cullinet instead made a series of remarks about its annual prospects which, when viewed in context, were components of a fraudulent course of conduct.

### III. *Order*

Based on the foregoing, Defendants' Motion for Summary Judgment is hereby ALLOWED with regard to plaintiffs' allegations that defendants engaged in an illegal course of conduct beginning with the May 30, 1985 press release, and otherwise DENIED. Accordingly, this court's June 18, 1987 Order is hereby amended pursuant to Federal Rule of Civil Procedure 23(c)(1) and the remaining class in this case consists of purchasers of Cullinet stock between June 17 and August 5, 1985, who claim to have been injured by a common course of fraudulent conduct during that period.