**William STEINER, on behalf of himself and all others similarly situated, Plaintiff,**

v.

**TEKTRONIX, INC., et al., Defendants.**

**Civ. No. 90–587–JO.**

United States District Court, D. Oregon.

Aug. 17, 1992.

869

Edward P. Dietrich, Wolf Haldenstein Adler Freeman & Herz, New York City, Francis M. Gregorek, Wolf Haldenstein Adler Freeman & Herz, William S. Lerach, John W. Jeffrey, Milberg Weiss Bershad Specthrie & Lerach, San Diego, CA, Henry Kantor, Kantor & Sacks, Portland, OR, for plaintiff.

Lois O. Rosenbaum, Barnes H. Ellis, Stoel Rives Boley Jones & Grey, Portland, OR, for defendants.

## OPINION AND ORDER

ROBERT E. JONES, District Judge:

Federal securities laws are intended to provide investors with full disclosure of stock information and protection against fraud, not to insulate them from stock market fluctuations. That sort of insulation is precisely what plaintiff, representing the class of shareholders, is seeking in this action. Because he has failed to come forward with facts showing a genuine issue for trial on his allegations of fraud, defendants' motion for summary judgment is granted.

INTRODUCTION

In this class action shareholders' suit, purchasers of stock in Tektronix, Inc. have charged the corporation and its directors and officers with fraudulently concealing the company's financial downturn, which class mem-

bers claim caused them to purchase stock at an artificially inflated price.

The class is represented by William Steiner, who bought 200 shares of Tektronix (Tek) common stock at $18 per share on December 29, 1989. The class was certified in February, 1991, and is defined to include all persons who purchased or otherwise acquired shares of Tek common stock during the period from August 18, 1989 to and including February 20, 1990.

Defendants in this action are Tektronix, an Oregon high-tech firm with headquarters in Beaverton, and the following Tek officials:

—David Friedley, chief executive officer (CEO) and president until his (apparently forced) resignation on April 20, 1990.

—R. Allan Leedy, Jr., vice president, secretary, general counsel and (until April, 1990) acting manager of finance and control (or chief financial officer).

—Robert W. Lundeen, chairman of the board of directors and CEO following Friedley's resignation in April, 1990. Plaintiff refers to Friedley, Leedy and Lundeen as the "executive defendants."

—William Walker, director and former executive vice president. He was named the company's president and chief operating officer (COO) following Friedley's resignation in April, 1990.

—Paul E. Bragdon, director and chairman of the board's audit committee.

—F. Paul Carlson, director.

—A.M. Gleason, director. Walker, Bragdon, Carlson, Gleason and Lundeen made up the board's audit committee. These five plus Friedley are referred to by plaintiff as the "director defendants."

Plaintiff claims that defendants violated Sections 10(b)[1] and 20[2] of the Securities Exchange Act of 1934, 15 U.S.C.A. §§ 78j(b), 78t(a) (1981) and Rule 10b–5[3] promulgated thereunder. His theory is that defendants, as "control persons," issued public documents and statements that omitted adverse information material to the financial condition and prospects of Tek, which resulted in an inflated market price of Tek stock.

Plaintiff has also brought suit on a state claim of negligent misrepresentation by virtue of supplemental jurisdiction. Defendants have moved for summary judgment on all claims.

## BACKGROUND AND FACTS

Tektronix was founded in 1946 and by 1981 was Oregon's largest employer. The company employed 24,000 people worldwide and was preeminent in the field of oscilloscopes, used to measure electronic waves.

In fiscal 1981, the company's sales were over $1 billion. Earnings were $800 million, and earnings per share (EPS) were $4.34.

Between 1981 and 1988 the company suffered a downturn. The market for oscilloscopes had leveled off and Tek faced stiff competition from Hewlett–Packard to hold its market share. Efforts to enter the com-

1. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— ...

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. "(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in

good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

3. "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security."

puter aided engineering (CAE) market had been expensive and unsuccessful.

By 1986 Tek's earnings had declined sharply. In 1986, earnings per share were 66 cents. In 1988, Tek reported an earnings loss for the first time in its history as a public company. That year (fiscal year 1988, which ended May 28, 1988) it lost $17 million, or 55 cents per share.

Tek's directors believed the company needed a more aggressive leader to restore the company to profitability. In November, 1987, the board elected David Friedley as the company's new president and chief executive officer after firing his predecessor. Friedley was a 13–year Tek veteran who had been head of the company's Grass Valley (Calif.) and communications groups, which designed and produced television and production test equipment.[4] He and his management team immediately made a number of changes aimed at improving the company's financial picture. Those changes saw the company:

—lay off 1,000 employees in 1988 and 377 in 1989. By the end of fiscal year 1989, the company had 15,708 employees, down from a 1981 high of 24,637 employees.

—terminate senior managers Friedley felt were ineffective, replacing them with managers in whom he had more confidence.

—drop out of the CAE business. The company realized that the amount of money required to successfully compete in this market would exceed the short-term returns it would realize. By eliminating this business, the company also eliminated an on-going cash drain.

—decentralize its business units to place more authority and responsibility at the division level, thus increasing accountability for profit contribution by division managers.

—reorganize its international markets strategy, so that international business was organized by product line rather than on a country-by-country basis.

—terminate ongoing engineering activities that Friedley believed would not turn in to profit-generating products within a reasonable time frame. The new management team focused on development of new products, such as the graphic super workstation (the XD88) and the semiconductor test system (the LT1000) to be introduced to growing markets.

—unveil its new digital oscilloscope, a product aimed at blocking inroads Hewlett–Packard was making into the oscilloscope market that had been historically dominated by Tek.

These changes initially paid off for the company, putting Tek back into the black. For the fiscal year ending May 27, 1989, Tektronix earned $18.9 million or 66 cents per share on net sales of $1.43 billion (compared to the $17 million loss the previous year). Those figures were released on June 30 and July 21, 1989, and were also contained in Tek's annual report to its shareholders, published August 18, 1989.

At the time the annual report was released, the company had already developed its 1990 profit plan, an internal document used to set expenditure levels which projected total sales of $1.5 billion and earnings of $45 million, or $1.56 per share. However,

4. At the time Friedley took over the reins at Tek, the company was divided into three major groups: test and measurement, communications and visual systems. The reader may find helpful the following description of those groups, as described by Friedley in his affidavit:

Test and measurement was the biggest group and its principal product was oscilloscopes, Tek's flagship product. Oscilloscope application included electronic equipment design, scientific research and manufacturing test and service of electronic equipment. Government defense-related sales accounted for about 20 percent of oscilloscope sales. The group also made related products including digitizers, used in high-energy physics and nuclear research; logic analyzers, primarily used in the design of electronic products and systems; spectrum analyzers, used in the design and service of communications signals; and semiconductor test systems and accessories such as probes, cameras and carts.

The television industry was the primary market for the communications group, which made waveform monitors, vectorscopes, picture monitors, signal generators and other television test equipment. The Grass Valley Group was a leading supplier of television production and distribution equipment.

The visual systems group included two major subgroups: color graphic workstations and terminals, and color printers.

the actual numbers didn't live up to management's expectations. Tek issued a press release on September, 8, 1989, which disclosed the following disappointing news:

—the company lost $1.9 million, or $0.06 EPS, during the first quarter of fiscal year 1989 (ending August 19, 1989), compared to earnings of $7.4 million, or 26 cents per share, the previous year during the same period.

—first-quarter sales were down two percent compared to the same period the prior year.

—a total of 239 employees had been laid off during the quarter.

—The backlog of unfilled orders going into the second quarter was $24 million less than for the prior year.

In its first-quarter 10–K quarterly report filed with the Securities and Exchange Commission on September 29, 1989, the company reported that sales had decreased 2.3 percent from the prior year's same period; cost of sales as a percentage of net sales had increased; the company's business was negatively impacted by competitive pricing pressure, low utilization of capacity, increased costs of new products and a strong dollar; and nonoperating income was down.

On September 21, 1989, Moody's Investors Service, Inc. announced it had downgraded $75 million of Tek senior notes due in 1995 from A3 to Baa2, citing the company's weakened business prospects and the likelihood that its future cash flow would be well below past levels.

On September 25, 1989, Standard and Poor's Corp. placed Tek's senior unsecured notes and commercial paper on Credit–Watch with negative implications because of the company's potential for continued below-par profitability.

A month later, on October 24, 1989, Duff & Phelps, Inc. announced it was downgrading the company's senior debt rating from A to A–Minus and its commercial paper rating from Duff–1 to Duff–1–Minus due to increased business risk.

The company essentially broke even the second quarter of fiscal 1989. On December 1, 1989 Tek issued a press release announcing that earnings were $463,000, or 1 cent per share, for its second quarter ending November 11, 1989, compared with earnings of $7.3 million, or 26 cents per share, for the same period the previous year. The press release also announced that domestic and international sales were down two percent compared to the same period the previous year and another 333 employees had been laid off.

Tek's second-quarter 10–Q, filed on December 21, 1989, contained the additional information that cost of sales as a percentage of net orders had increased over three percent from the prior year and that Test and Measurement profit sales had declined 7.6 percent from the prior year.

Throughout January and February of 1990, it became clear that orders were not coming in at the rate projected in the 1990 profit plan. Friedley blames a number of factors for the drop-off in orders, including a sluggish economy, a long-term decline in military-related orders and price discounting by competitors. To make matters worse, in some areas where the company did have orders shipments were delayed because it couldn't get parts.

Also contributing to the company's lackluster financial picture was the fact that some units that were projected to be profitable continued to lose money as they racked up high marketing expenses trying to increase market share. Also disappointing was the below-plan performance of Sony–Tek, the company's joint venture with Sony Corporation formed to market Tek products in Japan. Results from other international markets were also coming in at below projections.

The company continued to implement cost-cutting measures. In a press release issued January 2, 1990, Tek announced the closure of its plant in Guernsey, Great Britain, which resulted in 220 people losing their jobs. Also that month, Friedley issued a directive that he must personally approve all new employees hired and the board voted to discontinue a program which permitted Tek employees to purchase stock at a 20 percent discount.

Orders continued to lag. The company's management council met February 20, 1990 and decided to lay off another 600 employees, a move that would result in a one-time charge against earnings to reflect severance costs. The lay-offs and their financial effect were announced the next day in a press release, along with the estimate that the one-time charge against earnings would not exceed $20 million.

The company announced in a March 23, 1990 press release that the one-time charge against earnings was actually $12 million. That release also contained the news that the company lost $25 million in its third quarter of the fiscal year, for a loss per share of $0.88; that compared to earnings of $6.3 million, or $0.22 EPS, the prior year. Sales in the quarter were down 3 percent from the prior year. The following comments were also contained in the release:

> "We are disappointed that we have not yet achieved the sales growth we had planned," commented Dave Friedley, President and CEO, "but we are making aggressive changes to get expenses in line with revenue. Our product line is in solid shape, and orders are up slightly despite a difficult environment for many of our customers."

The board fired Friedley the next month. According to Lundeen, "the board had concluded that [he] was not capable of managing the company out of the problems which it had."

## TEKTRONIX: SELECTIVE DISCLOSURE?

Plaintiff's contention is that throughout the class period defendants concealed the true condition of the company's financial condition, which artificially inflated the price of Tek stock. More specifically, plaintiff claims that from at least August 18, 1989 (the date the annual report was released and the start of the class period) through February 20, 1990 (the end of the class period) defendants disseminated a series of false and misleading statements about Tek's current and future financial condition to Tek stockholders, the investing public and the financial community.

He also charges defendants with withholding information about the company's products and plans to lay off 1,900 employees, along with falsely representing that earnings were expected to improve and that the company's restructuring had been successfully completed.

How did defendants pull off this allegedly elaborate scheme to defraud stockholders, and why did they do it? Plaintiff points to the following evidence in support of his theory:

*The annual report.* The cornerstone of plaintiff's claim is that statements in the 1989 annual report were false and misleading, creating an optimistic scenario for Tek's future that was unfounded.[5] He quotes extensively from the report in his complaint, including the following excerpt from the introduction:

> Tek ended a tough year a leaner, cleaner and more strategically focused organization ... And a profitable one, moving from last year's loss to 66 cents per share earnings.
>
> It has been a year of modest and hard-won headway. Your company a year ago was in need of a turnaround. Our new management team saw three things to do: Stop the bleeding, lay a solid foundation for growth—and then grow. The first has been done by exiting or scaling-down losing businesses; the second, by hammering out a sound strategy and radically restructuring the company so it can best carry out that strategy.
>
> The third, resuming a pattern of growth, has yet to happen. That is this year's target ...
>
> It has been a tumultuous year, for our organizations and their people. And, although the fixing is pretty much done, the changes will continue. Although there's no point in fixing things that aren't broken, we must always be unbiased about better ways of doing the job. Anything that's been done the same way for five years is probably in for a hawk-eyed review ...
>
> Our new year began with a record low order backlog, and some of our new products just moving to delivery.... *so our*

---

5. See Exhibit A, Tektronix 1989 annual report, Friedley letter to shareholders.

*turn-around is not complete. But we are surely turning around.* Our businesses are sharper, more focused. Our product line is strong across the board. We have built a solid launching pad for the future. And no grass is growing under our feet. [Emphasis added.]

This letter to shareholders, signed by then-president and CEO Friedley, is followed by a section headlined, "A 'C' for the year." This discussion of the company's financial summary includes the following statements:

> ... We don't give ourselves a corporate report card, of course. But the year's financial summary can't help looking like one; and it may suggest that 1989 was a "C" year: *Moving from a loss to a modest profit; earnings up, although not resoundingly; expenses down, but not enough.*
>
> There's no shying away from the numbers. They're disappointing. But there was far more to Tek's year than that. Without a few interpretive words, for instance, the earnings figure can mislead you to believe things were worse than they really were—or, on the other hand, better.
>
> ... [C]andor prompts us to note that the shift from loss to profit can be misread. Pretax income of $57 million is more than what last year's would have been even without the one-time "unusual" charges of $32 million that year. But non-operating income is much higher this year than last. That says our operating income (a common measure of performance) has not improved to the bragging point. Emotionally bumpy, financially flat, the year we leave behind is the kind of year you like to leave behind ..

Defendants say that the company's optimism that it was "surely turning around" was sincere based on the 1990 internal profit plan and its projected revenue growth of 8.4 percent and earnings per share of $1.56. They say that optimism was also based on a positive 1989 earnings of 66 cents per share, compared to the 55 cents per share loss in 1988; the fact that they pulled the plug on the CAE business and other unprofitable engineering efforts; the development of new products; employee layoffs; reorganization of the company's international business; and the decentralization of Tek's business units.

Plaintiff says that defendants can't point to 1989 earnings figures as evidence of their sincerity because those results were a "historical aberration." He notes that in 1990, the company lost $3.19 per share. He characterizes the 1989 results as a "sandcastle built of earnings pulled from 1990," referring to his allegation that defendants accelerated the company's shipping schedule so that 1989 performance would be beefed up at the expense of 1990 earnings. Also contributing to the improvement in 1989 were excellent Sony–Tek results, which defendants say were the result of expedited orders in anticipation of a Japanese sales tax increase.

*Press releases.* During oral arguments on this motion, plaintiff's counsel focused on whether Tek was truly turning around and Friedley's promise to embark on a three-year program aimed at making the company profitable again. He pointed to the following two press releases issued by the company:

—In a release dated June 30, 1989, the company announced that it expected to earn between $18 million and $20 million for the fiscal year ending May 27, 1989, compared to a loss of $16.7 million the previous year. The release continued:

> Commenting on these preliminary results, President and CEO David Friedley noted, "In fiscal 1989 we began a turnaround, reversing the loss of the prior year. Our income before taxes is also more than three times last year. We are going in the right direction.
>
> While these results are better, we have a way to go to hit our long-range targets. We expect much better results in the coming year. In the past few months we launched a number of key products, including the XD88 superworkstations and the DSA600 high-performance instruments, and the early market reception has been very encouraging. However, introductions are expensive, and we saw that expense at the end of the fiscal year."
>
> ... Friedley summarized the year by saying, "We have laid the foundation with new products and refined strategies. We are looking forward to our new fiscal year."

—In a release dated July 21, 1989, the company announced that its earnings for the fiscal year ending May 27, 1989 were $18.9 million, or $0.66 per share. Sales were up 1 percent from the prior year. The release contains the following Friedley quote:

"We have begun to turn around Tek's bottom line ... Fiscal 1989 was also a year of building a foundation with organization, strategies, and new products, all aimed at better results in the future. The fourth quarter was somewhat disappointing, and we may have another rough quarter in the beginning of fiscal 1990, but we believe we are going in the right direction."

Plaintiff points to a draft press release dated February 9, 1990 as evidence that defendants withheld information about impending layoffs. That release reads in part:

Tektronix ... announced today that it expects to record a loss in its fiscal third quarter which ends on March 3, 1990. The Company also announced plans to reduce expenses and sell certain unprofitable businesses in order to return the company to profitability in 1991. Those plans will generate write-offs in the third quarter of approximately $xx million, in addition to the expected loss from operations.

... The Company plans to reduce employment by approximately xxx people by the end of its current fiscal year on May 26.

... As a result of the decisions to reduce employment and sell businesses, the Company expects to have write-offs in the fiscal third quarter of approximately $xx million. This amount is in addition to the expected loss from operations in the quarter.

The press release that was issued on February 21, 1990 fills in some of the blanks:

Tektronix ... today forecast its results for its third fiscal quarter, and announced steps to streamline its operations and improve profitability.

... After interest expense, non-operating income, and a tax provision of approximately $9 million, the Company expects to record a net loss for the quarter. Sales in the quarter are likely to be slightly below last year's third quarter of $434.1 million.

The Company also announced that it expects to reduce employment by about 600 people by the end of the fiscal year on May 26 ...

Charges for severance pay and other costs related to the charges planned have not been finalized, but they are not expected to be greater than $20 million ...

"We expected our new product flow would provide us with enough growth to begin to show earnings improvement," said David P. Friedley, Tektronix' President and Chief Executive. "That is not happening, partly because of weak industry demand in the defense, computer, and semiconductor businesses. Our product line and market positions remain strong, but we must get our expenses in line with our revenue."

*A Credit Crisis?* Plaintiff maintains that concern about the company's position in renegotiating a bank loan gave defendants reason to conceal the company's true financial picture.

The undisputed facts are that Friedley, Leedy and other Tek officers met with the company's bankers on February 12, 1990. On February 21, the announcement was released regarding the lay-offs and charge against earnings. Shortly after that, the company reached an agreement on the terms of a renegotiated bank loan. The $20 million write-off forced Tek to request a waiver of its tangible net worth loan covenant, which it received before issuing its 1990 annual report.

Plaintiff alleges that the February 12 meeting was to discuss the company's credit and that Tek officials didn't bring up the possibility of layoffs and write-offs, even though both were discussed in the February 9 draft press release. Plaintiff alleges that defendants also neglected to mention a $100 million shortfall in sales, even though it had been forecast by Tek controllers in December, and the possibility of $100 million in expense reductions that had been discussed by Tek officials a month earlier.

As evidence that defendants were purposely concealing the company's financial situation, plaintiff points to a memo to Friedley from Fletcher Chamberlin, Tek's director of

investor relations (who also wrote the company's press releases). In this interoffice memo dated January 29, 1990, Chamberlin urges the CEO to communicate the company's financial recovery plan to investors and employees in order to shore up support. He says making changes in a "piecemeal fashion" will come across as "business as usual":

> Business as usual while we are losing money will quickly lose the support of employees and investors.
>
> Here is the approach I suggest:
>
> 1. *Declare a crisis.* This is mostly a matter of publicly acknowledging the reality: multimillion-dollar losses, the vast majority of businesses losing money, negative cash flow, new product successes not enough to offset declines in base business. Investors need to see you taking charge and making changes to fix performance . . .
>
> The message to date has been built around the three-step plan: 1) stop the hemorrhaging,[6] 2) build a foundation, and 3) then grow. It's clear that part # 3 is not happening. We need to admit that; that creates the crisis . . .
>
> I am also going to have to admit to analysts on the phone soon that orders are not picking up and that all their estimates for the third quarter are way too high. Because it is significant news that I can't selectively give to people one by one on the phone, we'll have to do a press release.

A revised version of this memo, dated January 31, 1990 says the company needs to "state the problem bluntly," instead of declaring a crisis. It also contains the additional paragraph:

> I realize that big write-offs will create problems with our bank agreements which are now moving toward renegotiation. We need to get the banks on board with the changes we are making, and why they are necessary. That's better than setting an agreement and surprising them later.

Defendants offer a different version of the February meetings with their bankers.

They say the February 12 meeting was to give the banks an update on how things were going at Tek, not to discuss the company's "credit worthiness," as plaintiff contends; at any rate, defendants say that Tek was upfront with bankers in attendance about its financial problems. They also argue that the February 21 announcement regarding layoffs and write-offs was made voluntarily by Tek several days *before* the deadline for reaching an agreement on the terms of the renegotiated bank loan and that change in the company's financial picture meant only that Tek had to draft a revised term sheet.

## STANDARD OF REVIEW

When the court considers a motion for summary judgment, it must view the evidence in the light most favorable to the nonmoving party. If the court finds no issue of material fact, then the moving party is entitled to summary judgment as a matter of law. *Hutchinson v. United States,* 838 F.2d 390, 392 (9th Cir.1988).

The party opposing the motion must set forth facts demonstrating a genuine issue for trial and not rest on conclusory allegations. *Id.*

If the moving party has carried its burden under Federal Rule of Civil Procedure 56(c) of demonstrating the absence of a genuine issue of material fact, the nonmoving party must do more than "simply show there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

To have a genuine issue for trial, the nonmoving party must have enough evidence on its side for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

---

**6.** Comparing cash outflow to bloodletting is apparently popular among financial and corporate players. This comparison was documented in the popular press in Tom Wolfe's *The Bonfire of the Vanities,* in which protagonist Sherman McCoy uses the phrase "hemorrhaging money" to refer to both market losses and his wife's spending.

Issues of materiality and scienter are fact-specific and should generally be left to the trier of fact. *In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1113 (9th Cir. 1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) (citations omitted). However, summary judgment on those issues may be appropriate in securities fraud cases. *Id.*

■ To defeat summary judgment in a securities fraud case, plaintiff must show that "a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *In re Convergent Technologies Securities Litigation,* 948 F.2d 507, 512 (9th Cir.1991).

## DISCUSSION

### THE SECURITIES FRAUD CLAIM

■ In order to establish liability under Rule 10b–5, plaintiff must prove that defendants made false or misleading statements of fact with the intent to deceive or with reckless disregard for the truth of those statements. Additionally, plaintiff must prove that he and the class relied on those statements and that they were material. *Apple,* 886 F.2d at 1113; *Basic Inc. v. Levinson,* 485 U.S. 224, 230–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1983); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197–99, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). Finally, plaintiff must show that he and the class were injured as a result of the alleged misrepresentation.[7]

### 1. *Opinions and Projections*

■ While the most obvious example of a false or misleading statement is a misrepresentation of historic fact, projections and general optimistic statements can also be actionable under federal securities laws. *Apple,* 886 F.2d at 1113 (citations omitted). A projection or optimistic statement implies three factual assertions: (1) that the statement is genuinely believed; (2) that there is

a reasonable basis for that belief; and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. If one of those implied factual assertions is inaccurate, the projection or statement may be actionable. *Id.* (citing *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 490 (9th Cir.1974)).

A California district court recently noted that the Ninth Circuit's *Apple* approach to actionability—and common sense—tell us that courts must be wary of letting a case go to trial on the basis of confusing and speculative inferences in regard to forward-looking projections.

... That is why 10b–5 liability for a projection requires that there be either *no* reasonable basis for believing that the projection was accurate or the awareness of undisclosed facts tending to *seriously* undermine the accuracy of that projection.

*In re Adobe Systems, Inc. Securities Litigation,* 787 F.Supp 912, 919 (N.D.Cal.1992) (citations omitted). Otherwise, every case where an investor cries fraud based on a projection would go to trial, because the triable issue would become whether or not the defendant correctly interpreted data in making his projection. "[F]or, indeed, every projection of corporate earnings is uncertain and subject to different predictive interpretations." *Id.*

Also instructive is the Sixth Circuit's discussion of economic projections in *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037 (6th Cir.1991), a securities fraud case in which the defendant manufactured construction equipment. The court said:

Economic projections are not actionable if they bespeak caution ... When a corporation, through its officers or otherwise, states an honestly held view based on the information currently before it, neither it nor its officers may be held liable pursuant to section 10(b) or Rule 10(b)(5)

... In determining whether the statements are actionable, the court must scrutinize the nature of the statement to deter-

---

**7.** Other elements of a successful claim, such as the requirement that plaintiff either bought or

sold securities, are not at issue in this case.

mine whether the statement was false when made.

*Sinay,* 948 F.2d at 1040 (citations omitted).

■ Plaintiff claims that statements made in the annual report were false and misleading when made. He points to the following phrases as some of the primary offenders: "booming business in Japan;" "sound unifying corporate strategy;" "radically restructuring" the Company and product line gaps filled with "competitive products," some of which had a "phenomenal early order rate." Plaintiff also claims that these positive statements were reinforced by press releases and public announcements by Tek officials.

Friedley, the company's ill-fated CEO, says in his affidavit that to the best of his knowledge, every statement contained in the annual report—specifically the president's letter, which he signed—was factually accurate and correctly represented management's views. According to Friedley, the letter points out that growth had not yet occurred and was a target; the company was beginning the year with a record low order backlog; new products were just moving to delivery; and the company's turnaround was still not complete.

The other defendants also submitted affidavits in which they testify that the statements in the annual report and other publicly-released documents were sincere and accurate to the best of their knowledge.

Reviewing the record as a whole, and without engaging in resolving any disputed facts, the court finds that plaintiff has not met his burden of providing evidence sufficient to prove his claim that defendants made statements that were false and misleading. First of all, failure to be clairvoyant is not a sign of Tek's lack of sincerity. The fact that Tek lost $3.19 per share in 1990 does not make the company's *1989* annual report statement that it is "surely turning around" fraudulent. And aside from the fact that defendants obviously couldn't know with certainty in 1989 that the modest gains of that year would not hold up the next year, no evidence supports the allegation that the profitable 1989 year was a "historical aberration." In fact, the downturn of the 1980s appeared to be the historical aberration in light of the company's many years of profitability as a public company.

Plaintiff alleges that Tek management was directed to ship all unfilled orders before the end of fiscal 1989, regardless of the date that the customer wanted the goods, and to recognize all revenue the day of shipment. Plaintiff dwells extensively on this alleged backloading plan, characterizing it as senior management pressuring their subordinates to "ship everything possible."

However, although a plan to "ship now and bill later" was apparently proposed, the evidence unequivocally shows it was rejected. Furthermore, the court agrees with defendants that plaintiff has submitted no evidence that the company improperly recognized revenue in 1989; independent auditors found the company's financial statements fairly presented the company's financial position at the end of fiscal 1989. Defendants also point out that Tek expressly noted in the annual report that the company was entering 1990 with a record low order backlog that was a cause for concern with regard to first-quarter earnings and that the first quarter would likely make a poor showing in comparison to 1989.

Perhaps most significant is that when read as a whole, the 1989 annual report does not present a picture of unbridled optimism. In his letter to stockholders, Friedley says "the changes will continue" and "our turn-around is not complete." Plaintiff describes Friedley's statement, "we are surely turning around," as boastful when, in fact, it sounds merely hopeful.

Overall, the almost ironic tone of the annual report conveys to the reader that the company is looking for silver linings in some very big thunderclouds. The image of company officials holding their heads up high as they walk through the storm is reinforced in the annual report's closing blurb, "Coming Attractions":

We start the year with a low backlog of unfilled orders. Several of our exciting new products will only begin to ship in the early part of the new year. So the first quarter will likely show poor comparisons.

Optimistic words at this point, in light of our recent years' performance and the first quarter's outlook, may look like what the pulp novels used to call a 'brave little smile.' Not so. We find solid reasons to be positive as our turnaround continues.

... So, without taking a gangway-here-we-come approach to the new year, we think you'll find Tektronix a company worth watching.

The last paragraph of Friedley's letter, which both plaintiff and defendants point to in support of their respective cases, is also significant:

Our new year began with a record low order backlog, and some of our new products just moving to delivery ... so our turn-around is not complete. Our businesses are sharper, more focused. Our product line is strong across the board. We have built a solid launching pad for the future. And no grass is growing under our feet.

As mentioned earlier, plaintiff places great emphasis on the company's use of the phrase "turn-around;" one of his primary allegations is that Friedley said that the company was "surely turning around" when, in fact, it would lose money the next year. The court finds no precedent for the proposition that a phrase or series of phrases, taken out of context, will support a claim of fraud. As the Ninth Circuit held:

... [A]n issuer's public statements cannot be analyzed in complete isolation. "Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." *McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576, 579 (2nd Cir. 1990).

*Convergent,* 948 F.2d at 512. In *McMahan,* the case cited by the Ninth Circuit in *Convergent,* the defendants maintained that statements they made were literally true; the Second Circuit found, however, that when read as a whole the defendants' representa-

tions contained a "richer message than that conveyed by a literal reading of the statements."

The central issue ... is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor

.         .         .         .         .

*McMahan,* 900 F.2d at 579. The flip side of this principle, then, is that although plaintiff may argue that a *literal* reading of defendants' statements that the company was "surely turning around" could possibly mean that the company would make money the next year, a reading of such statements *in context* conveyed a different picture. At the risk of repetition, the court returns to Friedley's letter in the annual report: he told the shareholders that "resuming a pattern of growth, has yet to happen," and that "our turn-around is not complete." Read as a whole, the clear impression is that the company is still in transition and growth remains elusive.

Plaintiff's isolation of the phrase "turn around" also troubles the court in that he is taking a vague metaphor and attempting to define it in concrete, universal terms. Authority exists for the proposition that general terms such as "high value" and "fair" can be actionable in securities fraud cases: "... conclusory terms in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading." *Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, ——, 111 S.Ct. 2749, 2758, 115 L.Ed.2d 929 (1991). However, courts have also found outer limits to such actionability: "The courts have held that vague expressions of optimism as to future performance are mere 'puffing' and are not actionable under the securities laws." *Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1519 (N.D.Cal.1990) (citations omitted). Plaintiff has singled out the phrase "we are surely turning around." But from what to what, and to what extent? From marginal profit to record-breaking profit? What stockholder

**880**

could possibly be misled to consider such vague expressions as representations of fact upon which to decide to invest, especially when advised in concrete terms in the same publication that "our turnaround is not complete," and "resuming a pattern of growth, has yet to happen" and is only a "target."

The court hopes the point is clear: the annual report must be read in context and in its entirety. The sometimes hyperbolic contents of the letter to shareholders are presented in conjunction with unadorned financial statements. The overall picture presented from the copy in the annual report, as well as the financial statements, is that Tek is not out of the woods but is starting to see some light through the trees (to mix even more vague metaphors).

The court presumes that plaintiff and the class he represents know how to read an annual report. It further presumes that they read not just the glossy pages with big print and arty photos but those bond pages in the back with columns of numbers and dollar signs. Those back pages are no less important than the shareholders' letter which opens the report. "Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company." *In re Verifone Securities Litigation,* 784 F.Supp. 1471, 1481 (N.D.Cal.1992) (citation omitted).

I find no evidence that statements plaintiff points to as actionable were false when made. And returning to the *Apple* checklist, I find that plaintiff has not brought forth convincing evidence that any of the implied factual assertions in defendants' statements are inaccurate.

2. *Reliance/Materiality*

■ Even assuming, however, that plaintiffs could somehow make a case that defendants issued an actionable misleading statement or failed to disclose material information, their fraud claim still fails because accurate and complete information was disseminated through other sources and reflected in the stock's price, as explained below.

Plaintiffs bring this claim under a fraud on the market theory, which relieves them of the burden of showing individual reliance on a material misstatement. Instead, they are entitled to the presumption that they indirectly relied on the alleged misstatement by relying on the integrity of the stock price established by the efficient market. *Apple,* 886 F.2d at 1113–14.

The Supreme Court says this presumption is supported by "common sense and probability." *Basic Inc. v. Levinson,* 485 U.S. 224, 246, 108 S.Ct. 978, 991, 99 L.Ed.2d 194 (1988). "Recent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and hence, any material misrepresentations." *Id.*

■ In a fraud on the market case, the defendants' failure to disclose material information may be excused if that information has been made credibly available to the market by other sources. *Apple,* 886 F.2d at 1115. Misleading statements may also be excused if correct information has credibly entered the market. *Id.* Plaintiff and the class assert that if known and material facts are willfully or recklessly withheld by defendants, they cannot depend on the fact that the market knew there was *some* risk to escape liability. Plaintiff says those facts include Tek's production problems, the $100 million shortfall in sales predicted at the end of 1989 and the possibility of massive layoffs.

■ However, documents produced by defendants show that the market knew of serious and specific risks associated with the stock. For example, prior to the start of the class period, analysts made the following comments regarding Tek:

> During Friday's session, Tektronix announced the Q489 (May) would show a loss due to flat sales (up less than 1%), heavy expenses related to critical new product introductions and certain non-recurring charges. Reflecting its washed out character, the stock barely budged ... The 1 year new management team, is trying hard to get Tek growing again, though we are afraid that the economic environment is

not cooperating. Tek has plugged some serious gaps in its instrument product line (high end scopes and logic analyzers), is making decent headway in semiconductor test systems (important wins to be announced soon), has introduced two new terminal products, and is encouraged by the early progress of the new graphics workstations. Most of the expenses for these new products is past. Expenses are being clamped down also—Q489 included about $3M in severance that we estimate can save $10M pre-tax annually (300 people) ... Given that Q189 [August] is flat again, we doubt Tek shares will appreciate in the shortrun. We hold to our 3–3 rating but believe that the situation is getting interesting—FY 90 is a critical year. If significant progress is not shown in certain start-up businesses (workstations, terminals, semiconductor ATE), we would expect Tek to make another major restructuring. We continue to wait and watch with high interest.

—Shearson Lehman
July 3, 1989

*Management announced that Tektronix' fourth fiscal quarter will show a small after tax loss.* Despite a long list of cost-reduction moves, TEK continues to be adversely affected by a lack of revenue growth ... *The mixed business outlook puts Tek's new management in a difficult position.* We believe that when the firm's directors' [sic] replaced the former management and elected Dave Friedley CEO in the fall of 1987, he was given three years to improve the firm's operating results to satisfactory levels. Friedley moved to reduce costs and focus on those businesses where TEK is a leader; but for every success he has had another problem area surface. We believe that Mr. Friedley's job could be on the line. If TEK doesn't perform in fiscal 1990, there is a good chance of an even larger shakeup and possibly even sale of the firm ... Ironically, failure to raise profitability to acceptable levels could produce the most favorable stock performance scenario—a restructuring to TEK with the possible sale of the television products, instruments and/or computer graphics business. We

believe the three parts could easily be worth $40 or $50 a share.

—Fahnestock report
July 10, 1989

... Since we believe momentum in the overall electronics business is slowing, we are not counting on an early reversal of sluggish order patterns at TEK, despite some possible new product successes. Management continues to be aggressive in cutting costs and pushing faster product development cycles. We think this will have a long-term beneficial effect, but our near-term outlook remains unappealing. We are continuing with our Hold rating.

—First Boston
August 8, 1989

In September, 1989, stock analysts had the following to say about Tek:

—"We think the stock is washed out and keep our 3–3 ranking.... Another area of slippage is T & M where poor yields on inhouse produced semiconductor chips are delaying the shipment of a new logic analyzer even though orders are strong. T & M sales were down 3.3% though orders were up.

—Shearson Lehman

—"It would appear that with expenses remaining under control ... the persistence of flat order rates and a declining backlog have heightened the urgency to boost sales growth ... While there may be an opportunity for positive surprises, following this company may require enormous patience. Homer's 'Odyssey' would be an appropriate reading for this type of investment situation.

—Dain Bosworth

—"The major variables affecting orders and subsequent revenues are high end oscilloscopes, logic analyzers, spectrum analyzers and workstations. All of these products have good specifications but have had minor problems in ramping production ... We do not see major downside risk with the stock selling close to book value, but also believe that the stock will not outperform the market until the order growth rate improves."

—First Boston

By November, 1989, criticisms of Tek were even more pointed, with the following analyst urging investors to sell their stock if things don't improve at Tek:

We are hard-pressed to find many positive developments at Tektronix. After reporting a loss of $0.06 per share for the Company's first fiscal quarter ended August, it appears the second quarter may be fortunate to be above break even. We estimate fiscal 1990 earnings ending May will approximate $0.55 per share, down from $0.66 per share for fiscal 1989.

Numerous management changes and reductions of thousands of employees over the past several years with prospect for additional terminations have not been enough to return this Company to a reasonable profit level. We anticipate the current management team will continue to address the problems and opportunities that are confronting Tektronix; however, we would not be surprised to see a major restructuring proposed during the next year if the numbers do not improve ... It is difficult to evaluate what each division may be worth independently; however, the current structure is not working. Managers and employees continue to be shuffled and *the bottom line has continued to deteriorate.* With the belief that the Company's board of directors may seek major changes during the next year to improve shareholder value, we recommend investors retain their positions. If no changes appear forthcoming, we encourage investors to exit their positions. [Emphasis added].

—Piper, Jaffray & Hopwood
November 13, 1989

Newspaper reports also chronicled Tek's troubles:

—"Tektronix, Inc., of Beaverton, Ore., reported a loss of $1.9 million in its first quarter ended Aug. 19 ... Results were lower than expected but weren't too surprising, said Stephen Balog, analyst at Shearson Lehman Hutton. The loss is part of a long pattern of disappointment, he said."

—Wall Street Journal,
Sept. 11, 1989

—"A major reshuffling in Tektronix, Inc.'s test and measurement division will lead to a 5 percent employment cut within that division in the next several months .. [C]onservative estimates place the number of positions affected by the cut at between 200 and 300."

—The Business Journal,
Oct. 23–29, 1989

In *Basic,* the Supreme Court adopted the materiality standard set out in *TSC Industries, Inc., v. Northway, Ind.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757:

... Acknowledging that certain information concerning corporate developments could well be of "dubious significance," the [*TSC*] Court was careful not to set too low a standard of materiality; it was concerned that a minimal standard might bring an overabundance of information within its reach, and lead management "simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." .. It further explained that to fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."

*Basic,* 485 U.S. at 231–32, 108 S.Ct. at 983 (citations omitted).

The undisputed evidence shows that news accounts and stock reports chronicled Tek's troubles—including production problems, a multi-million dollar shortfall in sales, the potential for massive layoffs and Friedley's inability to turn the company around in three years—in extensive detail. The stock price reflected those publicized troubles. In light of that publicity, the court finds evidence presented by plaintiffs would not cause a reasonable juror to find that a reasonable investor would view information allegedly withheld by defendants as significantly altering the total mix of available information to investors.

3. *Internal projections*

■ A company does not have an obligation to disclose its internal projections.

*Convergent*, 948 F.2d at 516. In an earlier case, the Ninth Circuit explained:

> The SEC does not require a company to disclose financial projections ... It is just good general business practice to make such projections for internal corporate use. There is no evidence, however, that the estimates were made with such reasonable certainty even to *allow* them to be disclosed to the public.

*Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir.1980). However, partial disclosures of financial projections makes them material, and an individual may be liable under Rule 10b–5 if those projections which follow are not disclosed completely and accurately. *Vaughn*, 628 F.2d at 1221, n. 7 (citations omitted).

■ Plaintiff alleges that because defendants made partial disclosures they were required to disclose subsequent projections. As evidence of those partial disclosures, plaintiff points to statements by analysts.

As to the unattributed statements in the analysts' reports,[8] the court agrees with defendants that such statements are unidentified hearsay declarations and as such are not relied on in ruling on this summary judgment motion. These brief statements—isolated from documents which make no other mention of a "plan"—are insufficient evidence of defendants' disclosure of its internal plan.

■ Plaintiff also argues that discrepancies between defendants' public statements and information in a previously compiled internal report are material to an investor and as such must be disclosed. But that is just the sort of discrepancy that the *Convergent* court determined wasn't actionable. As the *Adobe* court said, citing to *Convergent:* "The nondisclosure of internal corporate projections that have proven to be uncertain, much less significantly inaccurate, cannot serve as the basis for securities fraud liability." *Adobe*, 787 F.Supp. at 917.

During oral arguments, plaintiff's counsel conceded that Tek did not have to disclose its internal plan but that it had a duty of full disclosure, citing *Marx*. However, that duty of full disclosure doesn't come into play unless defendants have made a partial disclosure, and as noted above, plaintiff has offered no credible evidence that defendants partially disclosed Tek's internal plan. What plaintiff is left with is his allegation that defendants' optimistic statements ("... we are surely turning around") are material in light of defendants' possession of information that showed operating deficits, sales shortfalls, backloading and Japanese sales not anticipated in the internal plan. Those financial phenomena were either announced by Tek or reported by analysts and the press, and as such were not actionable, as explained above.

While the elements of a securities fraud violation are by no means black and white, plaintiff confuses the materiality analysis of optimistic statements with that of internal projections. In any case, he fails to provide sufficient evidence of liability for disclosure of Tek's internal plan and the court finds that the general rule that internal plans need not be disclosed applies.

#### 4. *Scienter*

■ In order to be held liable for damages under § 10(b) and Rule 10b–5, a defendant must have engaged in knowing or intentional misconduct. *Ernst*, 425 U.S. at 197–99, 96 S.Ct. at 1383. The Ninth Circuit has joined a majority of other circuits in holding that recklessness may satisfy this requirement of scienter in a civil action for damages under § 10(b) and Rule 10b–5. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991).

■ Summary judgment is generally inappropriate when mental state is at issue, unless no reasonable inference supports the opposing party's claim. *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d

---

**8.** These statements, listed in a footnote of plaintiff's brief in opposition to summary judgment, include "Tek is budgeting $1.50 roughly in EPS;" "demand appears to have slipped during the quarter—especially in the U.S. where demand seemed to be on plan in the first month of the November quarter;" "the company is close to plan on its new graphics workstation ... given that shipment of the product was delayed two months."

1434, 1436 (9th Cir.1984). However, a plaintiff must offer more than conclusory allegations, and if the defendant presents evidence establishing a lack of scienter, the plaintiff must produce some affirmative evidence. *Id.*

Plaintiff maintains that defendants' interest in protecting their positions was a "compelling motive" to withhold or conceal adverse information from investors. He also alleges that Tek's "desperate need to maintain and replenish its bank financing" provided additional motive to conceal its true state of affairs. In support of this, plaintiff alleges that although Tek knew in early February, 1989 that it was facing a new round of layoffs, company officials did not disclose that information to Tek's banks on February 12 when they met to renegotiate loan terms.

Defendants counter that the February 21 announcement regarding layoffs was made voluntarily by Tek several days before the date that an agreement was to be reached on the terms of a renegotiated bank loan. In addition, defendants offer unrebutted evidence that Tek officials did acknowledge the company's financial problems to bankers when they met with them on February 12.

Furthermore, defendants offer evidence that the final decision to lay off 600 employees was not made until a February 20 management council meeting. Although the company had obviously been considering downscaling its workforce, as evidenced by a draft press release regarding the layoffs, nothing in the record infers the final decision was made prior to February 20. Tek publicly announced the layoffs the next day.

In his dramatic preliminary statement, plaintiff makes much of a banker asking how Tek's financial situation could change so "massively" in the space of 10 days. He goes on to argue that if a Tek banker, "certainly a sophisticated observer motivated to closely follow Tektronix through personal meetings with senior management and otherwise to protect his bank's share of a $150 million loan agreement," could express surprise at a change in Tek's fortunes then clearly a reasonable juror could question defendants' argument that they had disclosed all material facts concerning the company.

The problem with plaintiff's expansive statement is apparent on its face. The banks were in the middle of negotiating loan terms with Tek. As plaintiff points out, the banker was motivated to protect his bank's position and as such surely made statements to achieve that goal. Any response by bankers to public announcements regarding Tek's financial changes must be considered in the context of the bankers negotiating the best terms for their banks. The fact that bankers, with their obvious vested financial interests, told Tek officers they were surprised at the company's financial announcements does not mean that a reasonable juror would question defendants' assertions that they disclosed all material facts regarding Tek. This posturing by bankers does not rise to the level of affirmative evidence of scienter.

Plaintiff gives a great deal of weight to Chamberlin's draft press releases and memos. However, like the evidence in the rest of the case, those documents must be considered in the proper perspective. Chamberlin, as head of investor relations, was charged with providing company officials with frank advice and different strategies for maintaining good relationships with directors, investors and analysts. Tek's corporate mid-life crisis was evident to analysts and the press and duly reported on throughout 1989.[9] In January, 1990, when Chamberlin urged Friedley to "declare a crisis," that crisis was already old news.

Plaintiff also argues that defendants were motivated to mislead investors in order to maintain their well-paying and prestigious positions. He alleges that Friedley's desire to keep his position and pay package lead him to make misleading statements, and points to the fact that Friedley was out of

---

9. Tek continues to suffer from financial and organizational problems, according to press reports. "Although marginally profitable in the 1992 fiscal year that ended May 30, a recession-plagued Tektronix recorded its lowest annual sales in nine years, just under $1.3 billion."

"Tek: Looking for a Turnaround," *The Sunday Oregonian,* July 19, 1992, Pg. S–1. That a newspaper headline writer used the term "turnaround" gives further credence to defendants' contention that it is a general term with no specific meaning or timeline.

work for 15 months after getting fired from Tek as evidence that Friedley had the intent to defraud investors. The court is not impressed.

During the current recession, as a matter of common knowledge, the business press has been rife with reports of former CEOs who are out of work for months—even years—after losing their jobs. In addition, turnover among corporate executives is hardly unusual in any economic climate. If shareholders sued a corporation every time a CEO was fired, claiming that fear of unemployment gave the corporate brass motive to mislead investors, the courts would indeed be clogged.[10]

In sum, I find insufficient evidence of knowing and intentional or even reckless misconduct to submit to any jury.

Reviewing the record as a whole, the court finds that plaintiff has not produced sufficient affirmative evidence on the issue of scienter to overcome defendants' motion for summary judgment.

### 5. *Damages*

■ Plaintiff alleges that as a consequence of defendants' wrongful conduct, he and other class members bought Tek stock at artificially inflated prices and have sustained damages. He claims that had he and other class members known of the materially adverse information not disclosed by defendants, they would not have purchased their stock at the artificially inflated prices they did.

As explained above, Tek's difficulties were disclosed by either defendants or analysts and the press and as such were reflected in the stock price. The court declines to engage in a further analysis of the damages issue because it has found no triable issue as to the fraud allegations. It does note, however, that Tek's stock price has hovered at around $18 this summer, the price it was

when purchased by plaintiff and class members three years ago.

### 6. *Controlling person liability*

Plaintiff alleges that defendants, in addition to being directly responsible for false financial statements and forecasts, are liable as "controlling persons" under § 20(a) of the Exchange Act.

■ This section imposes joint and several liability on people who directly or indirectly control a violator of securities laws. To state a claim that a defendant was a controlling person, a plaintiff must allege that (1) the defendant had the power to control or influence the violator and (2) the defendant was a culpable participant in the alleged illegal activity. *Wool v. Tandem Computers*, 818 F.2d 1433, 1440 (9th Cir.1987).

■ In order to prevail on a § 20 claim, plaintiff must also prove a primary violation of the securities laws by the controlled person which in turn caused injury to plaintiff. *Wool*, 818 F.2d at 1140–41, n. 8. Because the court has determined plaintiff has not established a primary violation, it need not reach the issue of controlling person liability.

### THE NEGLIGENT MISREPRESENTATION CLAIM

Because the court intends to dismiss this case, it declines to exercise supplemental jurisdiction over plaintiff's state law claim for negligent misrepresentation.[11]

### CONCLUSION

The Supreme Court offers a succinct discussion of the purpose of federal securities laws:

> Federal regulation of transactions in securities emerged as part of the aftermath of the market crash in 1929. The Securities Act of 1933 ... was designed to provide investors with full disclosure of material information concerning public offerings of

---

**10.** Many CEOs, aside from being well-paid, have contracts that provide them with large stock or cash severance settlements. That these "golden parachute" arrangements are commonplace is evidence that most CEOs know that losing their jobs isn't an unlikely scenario.

**11.** "The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ..." 28 U.S.C. § 1367(c)(3).

securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing ... The 1934 Act was intended principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets, and to impose regular reporting requirements on companies whose stock is listed on national securities exchanges.

*Ernst,* 425 U.S. at 192–95 96 S.Ct. at 1381–82. The goals of these acts—protection against fraud, promotion of honesty and fair dealing—are indeed worthy, and the regulation of securities transactions should be applied by the courts through vigorous enforcement of reporting requirements and antifraud provisions.

At the same time, the court must guard against litigious stock market profiteers who,[12] in response to stock downturns, hire seasoned lawyers [13] to look for any evidence or act that might through tortured reasoning give some vague implication of fraud.

The court has had the opportunity to consider the merits of this case, and it finds that the kind of "muddled and hypothetical speculations," *Adobe,* 787 F.Supp. at 918, presented by plaintiff do not rise to the level of triable issues of material fact. After reviewing the extensive record the court finds that plaintiff does not have sufficient evidence to justify submission to any jury.

Defendants' motion for summary judgment, # 139, is GRANTED in regard to all defendants. This action is dismissed.

12. The court does not mean to imply that Steiner necessarily falls into this category. However, he's undoubtedly litigious; in *Koenig v. Benson,* 117 F.R.D. 330 (E.D.N.Y.1987), where Steiner was also a plaintiff, the court noted that he is "termed a 'professional plaintiff' because he has filed 39 securities actions in the last three years and his caseload is so heavy that he can't even remember whether his cases are still active or have been settled." *Koenig,* 117 F.R.D. at 334.

13. The San Diego firm of Milberg, Weiss, Bershad, Specthrie & Lerach, co-counsel on this case, files more shareholders' suits than any other firm in the country, according to news accounts. "More Companies Succeed in Defending Charges that They Defrauded Investors," *The Wall Street Journal,* Page B–1, April 30. This is merely an observation and by no means a criticism of the expert and ethical lawyers who have represented plaintiffs' case courteously, promptly and professionally.

## EXHIBIT 1

TO OUR SHAREHOLDERS,

**t**ek ended a tough year a leaner, cleaner and more strategically focused organization....And a profitable one, moving from last year's loss to 66 cents per share earnings.

It has been a year of modest and hard-won headway. Your company a year ago was in need of a turnaround. Our new management team saw three things to do: Stop the bleeding, lay a solid foundation for growth—and then grow. The first has been done by exiting or scaling-down losing businesses; the second, by hammering out a sound strategy and radically restructuring the company so it can best carry out that strategy.

The third, resuming a pattern of growth, has yet to happen. That is this year's target.

Sales were up just a little, helped along by an excellent year for our Communications products and a booming business in Japan. We also saw growth in Portable Instruments and encouraging gains in newer, fast-growing product lines. But these were offset by a shortfall in demand for our older 7000-series laboratory oscilloscopes, logic analyzers and, particularly, our profitable graphic terminal line. (In each of these areas, strong new replacement products have since been introduced.)

The earnings figure disappoints me. But I feel very good about the improvements we've made in organizational effectiveness, product-line strength and competitive focus.

To sharpen the global competitiveness of each Tektronix business, the activities of our

International division have been re-assigned, and its responsibilities placed within each business group.

The same move was made with our large Service organization, and with elements of Finance and Administration. I believe our new organization will provide equal or better services more cost-effectively.

Those moves will do three things: Reduce overhead; bring each business into direct contact with its customers, with no buffer in between; and pinpoint the accountability for these activities. Sales, for instance, has been a fragmented responsibility; everyone shared the problems but no one felt them.

In their freshman year, the new members of our management team have acquitted themselves very well; they have rapidly gained the confidence of employees, customers and suppliers.

Our most time-consuming job has been to forge a sound, unifying corporate strategy. Its objective is the creation of loyal customers by applying our technology to serve their needs. With such an approach, a product is the means rather than the end.

Tektronix is technologically wealthy. Our technology will continue to be our major unique advantage. But it has suffered from a too-diffuse focus. Now—in addition to improving the profitability of our core businesses, those in which we lead—we are seeking out and serving vertical "niche" markets where the fit of our technology to customer needs seems most promising. Some of those niches could become quite large; the field of

888

color printing from computer output, for instance, may explode at any time. And we are setting the pace in that field.

Our technology focus, on which our business is based, is the generation, acquisition, processing and display of signals and images. The new corporate slogan, "The Visible Edge," reflects our new strategic thrust by putting appropriate emphasis on helping our customers visualize things, thus making them easier to understand.

Through thick and thin, we have been encouraged by the intense loyalty of Tektronix customers. That is our second competitive advantage. We intend to continue creating loyal customers through the best mix of product, service, quality, integrity, responsiveness and attentiveness to their needs.

A year ago ours was a strong product line but one with holes in it, inviting competitors to exploit them. We have filled those gaps with competitive products, many of them setting new standards for the industry. Our graphic superworkstation, an outstanding product, has strong and growing software support. We introduced the world's highest-performing spectrum analyzer. Our DSA600 digitizing signal analyzer has broken the barriers of oscilloscope performance, and is enjoying a phenomenal early order rate. Our LT1000 family has become the clear price/performance standard for semiconductor test systems.

It has been a tumultuous year, for our organizations and their people. And, although the fixing is pretty much done, the changes will continue. Although there's no point in fixing things that aren't broken, we must always be unbiased about better ways of doing the job. Anything that's been done the same way for five years is probably in for a hawk-eyed review.

I'm sometimes asked: When can we expect stability? My answer is: Never. Expect instead dynamism. In today's competitive world, only a changing, flexible company will survive. Only the fastest-afoot, most-responsive will prosper.

Our new year began with a record low order backlog, and some of our new products just moving to delivery...so our turn-around is not complete. But we are surely turning around. Our businesses are sharper, more focused. Our product line is strong across the board. We have built a solid launching pad for the future. And no grass is growing under our feet.

DAVID P. FRIEDLEY,
President and Chief Executive Officer

